UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                         :

TAFARI MBADIWE and RACHEL MILLER :
on behalf of themselves and all others similarly :
situated,                                   :

                          :          22-CV-9542 (VSB)

               Plaintiffs,    :

                          :        **OPINION & ORDER**

             -v-          :

                          :

AMAZON.COM, INC.,           :

                          :

              Defendant.  :

                          :
-------------------------------------------------------X

<u>Appearances</u>:

Daniel Zachary Goldman
Thomas Henry Bienert, Jr.
Nancy J. Sandoval
Bienert Katzman Littrell Williams LLP
San Clemente, CA

Gordon Ball
Gordon Ball, PLLC
Nashville, TN

Times Wang
North River Law, PLLC
Washington, DC
*Counsel for Plaintiffs*

Karen L. Dunn
William A. Isaacson
Amy J. Mauser
Martha L. Goodman
Meredith R. Dearborn
Dunn Isaacson Rhee LLP
Washington, DC
*Counsel for Defendant*

<u>VERNON S. BRODERICK</u>, United States District Judge:

Plaintiffs Tafari Mbadiwe ("Mbadiwe") and Rachel Miller ("Miller," together with Mbadiwe, "Plaintiffs"), on behalf of themselves and all others similarly situated, brought this class action against Amazon.com, Inc. ("Amazon" or "Defendant") asserting claims under various antitrust and consumer protection laws. Before me is Defendant's motion to dismiss the First Amended Class Action Complaint, (Doc. 24), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 59). For the reasons below, the motion is GRANTED IN PART and DENIED IN PART.

## I.    **Background**[1]

### A. *Amazon Platform, Third-Party Sellers, and the Business Solutions Agreement*

Amazon acts as "the world's largest online retailer" through various channels including its website, mobile application, and other devices (together, the "Amazon Platform"). (FAC ¶ 2.) Consumers can purchase two types of products on the Amazon Platform: (1) products sold by Amazon directly and (2) products sold by third-party sellers. (*Id.* ¶ 3.)

To sell on the Amazon Platform, a third-party seller ("TPS") must register with Amazon, pay a registration fee, and agree to the terms of Amazon's Business Solutions Agreement ("BSA"). (*Id.* ¶ 7.) Paying the registration fee and agreeing to the BSA were prerequisites for TPSs to sell products on the Amazon Platform. (*Id.* ¶ 38.) After making a sale, the TPS could choose either to fill the order itself or to use "Fulfillment by Amazon" ("FBA"). (*Id.* ¶ 41.)

---

[1] The facts in this section are based upon the factual allegations set forth in the First Amended Class Action Complaint, (Doc. 24 ("First Amended Complaint" or "FAC")), and the documents about "which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted). I assume the well-pleaded allegations in the First Amended Complaint to be true in considering the motion to dismiss pursuant to Rule 12(b)(6). *See USAA Cas. Ins. v. Permanent Mission of Republic of Namib.*, 681 F.3d 103, 105 n.4 (2d Cir. 2012). My reference to these allegations should not be construed as a finding as to their veracity, and I make no such finding.

Choosing the FBA method meant that the TPS would pay Amazon to store, pack, and ship products to customers, and even process customer-service requests and returns. (*Id.*) Enrollment in the FBA program also "increased the likelihood that Amazon's search algorithm selected" that TPS for the so-called "Buy Box." (*Id.*)

The Buy Box was a window on the product-details page on the Amazon Platform where customers could click "Add to Cart" or "Buy Now." (*Id.* ¶¶ 59, 61.) However, not every product had the Buy Box window; only one product from each product category was able to be featured in the Buy Box. (*Id.* ¶ 59.) To determine which product would be the "Buy Box winner," Amazon used an algorithm that would consider various factors "including the price of the product, the seller's rating, the seller's order cancellation rate, and the fulfillment method"— in other words, whether the TPS was enrolled in the FBA program. (*Id.* ¶¶ 59–60.) A customer using Amazon's mobile application who wanted to purchase a Buy-Box winner product could do so on the Buy Box, which "appeared directly below the product. (*Id.* ¶ 62.) In contrast, a consumer who wanted to buy a product from a seller who was not a Buy-Box winner would have to "scroll down" on the mobile application for "Other Sellers." (*Id.*) The Buy Box was important for sellers because "[a] very high percentage of sales on the Amazon Platform . . . were made as a result of the consumer clicking the Buy Box (as opposed to purchasing the product from 'Other Sellers')." (*Id.* ¶ 63.)

## B. *The Price Parity Restriction*

Until about March 2019, the BSA included a provision called the "Price Parity Restriction" or "PPR," which was binding on the TPSs. (*Id.* ¶ 9.) The Price Parity Restriction clause required each TPS to "maintain parity between the products" offered on the Amazon website and those offered on the TPSs' own sales channels—meaning that "the purchase price

and every other term of sale . . . is at least as favorable to Amazon Site users as the most favorable terms via [the TPSs'] Sales Channels (excluding consideration of Excluded Offers." (*Id.*)  During some portions of the Class Periods, defined *infra*, Amazon "reinforced" the PPR with a policy called the "General Pricing Rule," which required TPSs to keep the product price listed on the Amazon Platform "at or below" the product price offered and/or sold on a non-Amazon online sales channel.  (*Id.* ¶¶ 51–52.)  Amazon's goal for the PPR was to gain a competitive advantage over competitors.  (*See id.* ¶ 18 ("The Price Parity Restriction was a means by which Amazon weaponized its millions of third-party sellers against competing e-commerce platforms' efforts to gain market share by charging third-party sellers lower fees than Amazon.").)

Amazon deployed various mechanisms to ensure compliance with the Price Parity Restriction.  First, Amazon automated scans of competitor e-commerce platforms for the TPSs' products.  (*Id.* ¶¶ 10, 55.)  If the product was being offered on a non-Amazon site at a rate lower than that offered on the Amazon Platform, then Amazon would alert that TPS of its purported non-compliance with the PPR, sometimes within minutes of a violation.  (*Id.* ¶¶ 10, 56.)  Amazon could then "sanction[]" that TPS by "suspending its right to sell on the Amazon Platform or making its products appear less prominently in the search results on the Amazon Platform."  (*Id.* ¶ 10.)  One potential sanction was the loss of the Buy Box feature for that TPS.  (*Id.* ¶ 58.)  Such sanctions can be significant because, according to a 2018 survey, almost 50% of TPSs on Amazon "generated between 81% and 100% of their revenues from sales on the Amazon Platform."  (*Id.* ¶ 6.)  Indeed, TPS sales composed "over 50% of the units sold" on the Amazon Platform from 2018 to 2019.  (*Id.* ¶ 4.)  TPSs "needed access to the Amazon Platform for their businesses to survive given Amazon's dominant position in the e-commerce market."

(*Id.* ¶ 34.)  The Price Parity Restriction accordingly precluded TPSs "from offering their products for lower prices anywhere outside of the Amazon Platform."  (*Id.* ¶ 11.)

### C. *Third-Party Seller Fees*

Separate from the Price Parity Restriction, third-party sellers were required to pay certain fees to Amazon ("TPS Fees") before they could sell their products on the Amazon Platform. (*Id.*)  The TPS Fees included different types of fees, such as shipping fees, advertising fees, and referral fees (which were "usually 15%" of the product price), and these fees "in aggregate could equal up to 30% of the product price in 2018."  (*Id.*)  TPSs were thus "forced to incorporate Amazon's high fees and costs into their product prices."  (*Id.*)  Notably, because of the PPR, these higher product prices would be reflected on products regardless of whether they were sold on the Amazon Platform or another online retailer.  (*Id.*)

A TPS could sell a product on non-Amazon retail platforms for "significantly less" than the product price on Amazon, presumably because those platforms did not require such fees. (*Id.* ¶ 13.)  However, the PPR prevented TPSs from doing so.  (*Id.*)  These cost-savings could have been passed down to the consumer, and the prices of the products at issue here "would have been substantially lower" but for the Price Parity Restriction.  (*Id.* ¶ 15.)  "The Price Parity Restriction thus artificially inflated prices for third-party sellers' products sold outside of the Amazon Platform."  (*Id.*)  In other words, but for the Price Parity Restriction, TPSs would have sold products for lower prices "outside of the Amazon Platform."  (*Id.* ¶ 76.)

Amazon also required the Price Parity Restriction as a condition for sellers outside of the United States, including in Europe.  (*Id.* ¶ 53.)  However, in 2013, Amazon "withdrew" its PPR in Europe after a series of antitrust investigations by the United Kingdom and Germany.  (*Id.* ¶¶ 53–54.)  The Price Parity Restriction, however, continued to apply in the United States.  (*Id.*

¶ 54.)  Following congressional inquiries in late 2018, including by U.S. Senator Richard Blumenthal who requested the "'immediate[]' initiation of an antitrust investigation regarding the Price Parity Restriction," Amazon removed the PPR from the BSA in March 2019.  (*Id.* ¶¶ 77–79.)

### D.  *Amazon as First-Party Seller*

At the same time Amazon acted as the retailer for TPSs, Amazon also "sold products as a first-party seller that fell within the same categories of products sold by third-party sellers."  (*Id.* ¶ 46.)  Amazon directly sold myriad products, such as "clothing, shoes, jewelry, home and kitchen items, and electronics – in direct competition with its third-party sellers."  (*Id.* ¶ 45.) However, because Amazon (as retailer) sold the products for Amazon (as first-party seller), customers would view on the Amazon Platform the same types of products offered by both Amazon and its competitors, the TPSs.  (*Id.* ¶ 48.)  Indeed, Amazon, as first-party seller, considered itself "internal competitors" with TPSs.  (*Id.* ¶ 49.)

### E.  *Definitions*

Plaintiffs define the relevant market as the "market comprised of online platforms or exchanges that allow consumer to purchase retail products offered by different third-party sellers or made by different companies (the 'Online Marketplace Market')."  (*Id.* ¶ 85.)  Notably, the Online Marketplace Market does not include (1) "sales of used products," (2) "sales on websites owned by retailers directly," or (3) "sales of products sold at brick-and-mortar retail stores."  (*Id.* ¶¶ 88–89.)

Plaintiffs define Class Products to include those "that were protected from price competition by virtue of Amazon's Price Parity Restriction."  (*Id.* ¶¶ 96–98.)  A Class Product must meet two requirements:  "(1) [t]he product must have been sold through a retail

e-commerce channel other than the Amazon Platform or the third-party seller's own website," and "(2) [t]he product must have been concurrently offered by an Amazon third-party seller on the Amazon Platform at substantially the same price as the product was offered on the retail e-commerce channel in (1)."  (*Id.* ¶ 97.)

Finally, Plaintiffs define the Class Periods by each state.  (*Id.* ¶¶ 112–13.)  Although the beginning of the Class Period depends on each state, all the Class Periods end on March 2019, when Amazon removed the Price Parity Restriction provision from the BSA (the "March 2019 Removal Date").  (*Id.* ¶¶ 19, 112.)[2]

### F. *Plaintiffs*

The two named plaintiffs are both residents of the State of New York.  (*Id.* ¶¶ 25–26.) Tafari Mbadiwe purchased some toothpaste and a moisturizer on Walmart.com on December 3, 2018.  (*Id.* ¶ 25.)  Those product prices were "equal to the lowest prices listed for those products on the Amazon Platform" that day.  (*Id.*)  Rachel Miller purchased a cleanser on Sephora.com on February 11, 2019.  (*Id.* ¶ 26.)  She paid a price that was "equal to the lowest price listed for that product on the Amazon Platform at that time."  (*Id.*)

### II. <u>Procedural History</u>

Plaintiffs initiated this action on November 8, 2022.  (Doc. 1.)  On January 9, 2023, plaintiffs in *Frame-Wilson v. Amazon.com, Inc.*, No. 20-CV-424 (W.D. Wash. 2020) ("*Frame-*

---

[2] Plaintiffs make allegations regarding certification of a class action.  (FAC ¶¶ 113–121 (regarding class identity, numerosity, typicality, common questions of law and fact, adequacy, superiority, and risk of inconsistent judgments).)  The motion-to-dismiss briefs, however, do not raise issues related to class certification.  At the motion-to-dismiss stage, I decline to address any issues related to class certification.  *See In re Starbucks Emp. Gratuity Litig.*, 264 F.R.D. 67, 75 (S.D.N.Y. 2009) ("A district court may reserve decision on a class certification motion pending disposition of a motion to dismiss . . . ."), *aff'd sub nom. Barenboim v. Starbucks Corp.*, 549 F. App'x 1 (2d Cir. 2013).

*Wilson* Action")[3] moved to intervene and to dismiss, or in the alternative, to stay or transfer this case.  (Doc. 19.)  On March 29, 2024, I denied the motion to intervene.  (Doc. 66.)

Plaintiffs filed the FAC on January 20, 2023.  (Doc. 24.)  On April 12, 2023, Amazon filed a motion to dismiss, (Doc. 59), and a supporting memorandum of law (Doc. 60 ("MTD Br.").)  That same day, Amazon requested oral arguments on the motion to dismiss.  (Doc. 61.)  On July 5, 2023, Plaintiffs filed an opposition brief to the motion to dismiss.  (Doc. 62 ("Opp'n").)  On August 9, 2023, Amazon filed a reply.  (Doc. 65 ("Reply").)  On March 31, 2025, I denied Amazon's request for oral argument.  (Doc. 79.)

## III.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This standard demands "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

---

[3] The *Frame-Wilson* Action is another federal action that involves similar antitrust claims regarding Amazon and the PPR.  On December 3, 2024, Judge John H. Chun denied Amazon's motions to dismiss that action and another action, *De Coster v. Amazon.com*, and held that plaintiffs plausibly alleged a rule-of-reason claim and a monopolization claim under the Sherman Act.  *De Coster v. Amazon.com, Inc.*, No. 20-CV-00424, 2024 WL 4949037 (W.D. Wash. Dec. 3, 2024).  Although the *Frame-Wilson* and *De Coster* actions were not consolidated, Judge Chun granted the parties' stipulated motion regarding Amazon's motions to dismiss in the two actions and stated that his decision "applies 'equally to both *De Coster* and *Frame-Wilson*.'"  *Id.* at *1 n.1 (internal quotation marks omitted).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Finally, though all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

Antitrust claims in particular must be reviewed carefully at the pleading stage because false condemnation of competitive conduct threatens to "chill the very conduct the antitrust laws are designed to protect." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (internal quotation marks omitted). However, "[t]here are no heightened pleading requirements for antitrust cases," *Com. Data Servers, Inc. v. Int'l Bus. Machines Corp.*, No. 00-CV-5008, 2002 WL 1205740, at *2 (S.D.N.Y. Mar. 15, 2002) (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)), and "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly," *Todd*, 275 F.3d at 198 (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976)).

## IV.    <u>Discussion</u>

Plaintiffs seek damages under the antitrust and consumer protection laws of 29 states. (*See generally* FAC.) In short, Plaintiffs are consumers who "paid supra-competitive prices for products sold on e-commerce platforms other than Amazon because of an agreement or business combination that each of the third-party sellers were required to enter into with Amazon in order to sell their products on Amazon." (*Id.* ¶ 1.) Specifically, the Price Parity Restriction was a price-fixing agreement under state antitrust and consumer protection laws. (*Id.* ¶¶ 99–110.) The

two named Plaintiffs present identical legal arguments; the only different factual allegations are that Mbadiwe is a resident of New York, New York who purchased products on Walmart.com on December 3, 2018, while Miller is a resident of Brooklyn, New York who purchased a product on Sephora.com on February 11, 2019. (*Id.* ¶¶ 25–26.) Because the two named Plaintiffs make identical arguments, I address them together.

Plaintiffs allege that the Price Parity Restriction is both a per se violation and "an unreasonable restraint of trade under the rule of reason" in violation of state antitrust laws. (*Id.* ¶¶ 103, 108.) First, the PPR was a per se violation because Amazon, as first-party seller, sold its own products at lower prices "without risking losing sales" because similar products sold by TPSs were forced to bake in Amazon's high fees, resulting in higher product prices. (*Id.* ¶ 104.) Because of the PPR, TPSs' product prices were the "price floor wherever those products were sold online," and those price floors were increased due to Amazon's high fees. (*Id.* ¶ 106.) Second, Plaintiffs allege that the PPR violates state antitrust laws under the rule of reason. (*Id.* ¶ 108.) "Amazon weaponized its captive population of third-party sellers to thwart competition from competing e-commerce platforms. Amazon was relieved of the competitive pressure to lower the fees that it charged to third-party sellers because competing e-commerce platforms could not lower fees charged to third-party sellers as a means of trying to take market share from Amazon." (*Id.* ¶ 109.) Plaintiffs argue that there is "no procompetitive rationale for the Price Parity Restriction," and that any existing justification is outweighed by the Price Parity Restriction's anticompetitive effects. (*Id.* ¶ 111.)

**A.  *Applicable Law***

**1.  Timeliness**

A threshold issue is whether Plaintiffs' claims are time barred. "Although the statute of

limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)). "[S]tate statutes of limitations govern the timeliness of state law claims under federal diversity jurisdiction." *Personis* v. *Oiler*, 889 F.2d 424, 426 (2d Cir. 1989).

The First Amended Complaint affirmatively alleges various doctrines as a defense to any argument that the relevant the statute of limitations has lapsed. (FAC ¶¶ 122–26.) Plaintiffs initially invoked "the application of the discovery rule, the continuing violation doctrine, the equitable tolling doctrine, and tolling under *American Pipe*." (*Id.* ¶ 122.) In their opposition brief, however, Plaintiffs abandoned their arguments regarding "the discovery rule and fraudulent concealment."[4] (Opp'n 30 n.12.) Plaintiffs also abandoned the continuing-violations doctrine except as to the claims under Hawaii law. (*Id.*) Therefore, Plaintiffs only maintain defenses pursuant to *American Pipe* and the continuing-violation doctrine.

In *American Pipe*, the Supreme Court stated that "the commencement of the original class suit tolls the running of the statute of limitations for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974). The Supreme Court later expanded *American Pipe* tolling from individual actions in existing litigation to individual

---

[4] Equitable tolling is distinct from fraudulent concealment. *See Valdez ex rel. Donely v. United States*, 518 F.3d 173, 182 (2d Cir. 2008) (noting that "equitable tolling is often confused with fraudulent concealment"). But in arguing for equitable tolling, Plaintiffs seems to assert the theory of fraudulent concealment. (FAC ¶ 125 ("Amazon concealed the Price Parity Restriction until the March 2019 Removal Date at the earliest, such that any applicable state statutes of limitations affecting the rights to recovery by Plaintiffs and members of the Classes are subject to equitable tolling.").) Plaintiffs later disclaim reliance on fraudulent concealment. (Opp'n 30 n.12.) To the extent *American Pipe* tolling is a form of equitable tolling, *see Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 510 (2017), I consider *American Pipe* separately.

actions in new actions after the denial of class certification in the prior class action. *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353–54 (1983). However, the Supreme Court limited *American Pipe* tolling in *China Agritech, Inc. v. Resh*, 584 U.S. 732, 740 (2018), holding that a subsequent class action is not tolled after the prior action was denied class certification.

Plaintiffs here seek to apply *American Pipe* tolling to the state claims through cross-jurisdictional tolling, where a state's statute of limitations is tolled "by the pendency of a class action in another jurisdiction." *Chavez v. Occidental Chem. Corp.*, 933 F.3d 186, 189 (2d Cir. 2019). Therefore, in order for Plaintiffs' arguments regarding timeliness to be successful, each state must have adopted both *American Pipe* tolling and cross-jurisdictional tolling. *Id.* at 198 ("Despite some important similarities, *American Pipe* tolling and cross-jurisdictional tolling are different such that adoption of the former does not necessarily imply adoption of the latter."). "[A] federal court evaluating the timeliness of state law claims must look to the law of the relevant state to determine whether, and to what extent, the statute of limitations should be tolled by the filing of a putative class action in another jurisdiction." *Casey v. Merck & Co.*, 653 F.3d 95, 100 (2d Cir. 2011).

Under Hawaii law[5], antitrust claims are generally subject to a four-year statute of limitations. Haw. Rev. Stat. § 480-24. However, "a cause of action for a continuing violation is deemed to accrue at any time during the period of the violation." *Id.*

### 2. Antitrust Standing

To state an antitrust claim, a plaintiff must first show antitrust standing by showing that he: (1) has "suffered antitrust injury," and (2) is an "efficient enforcer[] of the antitrust laws."

---

[5] Plaintiffs' invocation of the continuing-violation doctrine is limited to their claims under Hawaii law. (*See* Opp'n 30 n.12 ("Plaintiffs further agree that the discovery rule and fraudulent concealment do not apply, and that, except for claims under Hawaii law, neither does the continuing violations doctrine." (citing MTD Br. 33–35)).)

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016).  To determine whether a

plaintiff is an efficient enforcer, some courts look to four factors set forth by the Supreme Court

in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*

("*AGC*"), 459 U.S. 519 (1983).  *See Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86, 98 (2d

Cir. 2022).  Those factors are:

> (1) the directness or indirectness of the asserted injury, which requires evaluation
> of the chain of causation linking [plaintiffs'] asserted injury and the [defendants']
> alleged price-fixing; (2) the existence of more direct victims of the alleged
> conspiracy; (3) the extent to which [plaintiffs'] damages claim is highly
> speculative; and (4) the importance of avoiding either the risk of duplicate
> recoveries on the one hand, or the danger of complex apportionment of damages on
> the other.

*Id.* (citation modified) (citing *AGC*, 459 U.S. at 540–44).

Some courts have noted that the first factor "must be met in every case."  *See, e.g.*, *In re*

*Aluminum Warehousing Antitrust Litig.*, 520 F. Supp. 3d 455, 474 (S.D.N.Y. 2021) (quoting

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014)), *aff'd*, No. 21-

643, 2023 WL 7180648 (2d Cir. Nov. 1, 2023).  However, it is not clear that this first factor is a

"requirement," as opposed to a factor.  When the Supreme Court used the phrase "must be met in

every case," it was analyzing claims under the Lanham Act, not under antitrust laws.  *Lexmark*,

572 U.S. at 125 n.2 (noting that claims under federal antitrust law were "not before [the Court]").

Moreover, the Supreme Court was discussing three considerations that the Third Circuit had

identified in *Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221 (3d Cir.

1998), and said that those three "must be met in every case."  *See id.* ("The first factor can be

read as requiring that the plaintiff's injury be within the relevant zone of interests and the second

and third as requiring (somewhat redundantly) proximate causation; but it is not correct to treat

those requirements, which must be met in every case, as mere factors to be weighed in a

balance.").  Therefore, it is not clear to me that the proximate-causation factor under *AGC* must be met in every case.  Indeed, *Lexmark* described *AGC* as setting out a "multifactor balancing test."  *Id.* at 123.   Moreover, the Second Circuit recently analyzed all *AGC* factors even after holding that the alleged injuries were too indirect to establish antitrust standing because "the weight to be given the various factors will necessarily vary with the circumstances of particular cases."  *See In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 261–63 (2d Cir. 2023) (internal quotation marks omitted), *cert. denied sub nom. BASF Metals Ltd. v. KPFF Inv., Inc.*, 144 S. Ct. 681 (2024).  Accordingly, I analyze all *AGC* factors.

The first *AGC* factor—and the only one that Amazon addresses in its motion to dismiss[6]—is "the directness or indirectness of the asserted injury."  *AGC*, 459 U.S. at 540.  "This factor turns on 'familiar principles of proximate causation.'"  *In re Am. Express Anti-Steering Rules Antitrust Litig.* ("*Am. Express*"), 19 F.4th 127, 139 (2d Cir. 2021) (quoting *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014)).  "For the purposes of antitrust standing, proximate cause is determined according to the so-called 'first-step rule,'" under which "injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior."  *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC* ("*Schwab*"), 22 F.4th 103, 116 (2d Cir. 2021) (quoting *Am. Express*, 19 F.4th at 140).  This inquiry "require[s] drawing a line between those whose injuries resulted from their direct transactions with [the defendant] and those whose injuries stemmed from their deals with third parties."  *Id.*

---

[6] Amazon argues that "Plaintiffs' Claims Violate the *AGC* Factors," but only references the first *AGC* factor of proximate causation between the antitrust violation and alleged injury.  (MTD Br. 8.)  I therefore devote most of this Opinion & Order to analyzing the first *AGC* factor of proximate causation.

### 3.  Per Se Standard vs. Rule of Reason

A per se violation of the antitrust laws involve "categorically unreasonable restraints on trade" due to "their inherently anticompetitive nature."  *United States v. Aiyer*, 33 F.4th 97, 114 (2d Cir. 2022) (citing *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).  "To justify a per se prohibition a restraint must have manifestly anticompetitive effects, and lack . . . any redeeming virtue."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (internal quotation marks omitted).  Under the per se rule, "there is no 'need to study the reasonableness of an individual restraint in light of the real market forces at work.'"  *Aiyer*, 33 F.4th at 115 (quoting *Leegin*, 551 U.S. at 886).  Examples of per se illegal restraints on trade under the federal Sherman Act include a horizontal price-fixing agreement among competitors and allocation of markets.  *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) (horizontal price-fixing); *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) (market allocation).  However, it is atypical for an alleged restraint on trade to be analyzed as a per se violation of the antitrust laws.  *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (explaining that the Supreme Court "presumptively applies rule of reason analysis" under the Sherman Act).

Rather, "most antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."  *Khan*, 522 U.S. at 10.  Vertical restraints[7], including those that effect prices, are generally subject to the rule of reason.  *See e.g.*, *id.* at 7 (vertical maximum price-

---

[7] In the antitrust context, vertical restraints are those "imposed by agreement between firms at different levels of distribution."  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).

fixing); *Leegin*, 551 U.S. at 882 (vertical minimum price-fixing).

**B.** *Application*

Amazon's motion to dismiss seeks dismissal of the First Amended Complaint arguing (1) lack of antitrust standing; (2) untimeliness; (3) state-specific arguments for failure to state a claim; and (4) failure to allege per se violations.  Each area involves the application of state law, so each state must be analyzed separately.

### 1.  Antitrust Standing under *AGC*

Amazon's motion to dismiss focuses on the first *AGC* factor of proximate causation in challenging Plaintiffs' antitrust claims under the laws of 29 states.  Specifically, Amazon contends that 27 of the 29 states on whose laws Plaintiffs rely would find antitrust standing lacking here because those states "have expressly adopted *AGC*, have a statutory mandate to construe their states' antitrust laws 'in harmony' with the federal antitrust laws, have a proximate causation requirement identical to the first *AGC* factor, and/or prohibit non-purchaser standing— all of which preclude Plaintiffs' claims."  (MTD Br. 9.)  Accordingly, the inquiry here essentially involves two steps:  (1) whether Plaintiffs lack antitrust standing under *AGC*, and (2) if so, what states, if any, incorporate *AGC* or a similar proximate-causation requirement in such a way where antitrust standing is lacking under those state laws.

I first analyze whether Plaintiffs lack antitrust standing under *AGC*.  The crux of Amazon's argument is that Plaintiffs lack standing under *AGC* for failure to plead a direct causal connection between the Price Parity Restriction and the allegedly inflated product prices. Amazon describes the causal chain in four steps:  (1) Amazon charges excessive fees to TPSs, (2) these fees lead to higher product prices on the Amazon Platform, (3) the Price Parity Restriction prevents TPSs from charging lower prices on the Amazon Platform compared to

other online platforms, and (4) due to the higher prices on the Amazon Platform, TPSs such as Walmart and Sephora, charge higher prices on non-Amazon platforms. (MTD Br. 10.) According to Amazon, the causal chain is too attenuated to provide antitrust standing under the first factor set out in *AGC*.[8]

### a. Issue Preclusion

Plaintiffs do not contest that the *AGC* analysis applies here. (Opp'n 3–4 ("Plaintiffs have sufficiently alleged that they are efficient enforcers under *AGC* . . . .").) Instead, Plaintiffs' primary rebuttal to Amazon's arguments regarding the proximate-causation factor under *AGC* and antitrust standing is that Plaintiffs are collaterally estopped because the court in *Frame-Wilson* held that the first *AGC* prong, the "directness or indirectness of the asserted injury," was alleged. (*Id.* at 3.)

Offensive collateral estoppel prohibits a defendant "from relitigating an issue that was decided in a prior case against the defendant." *Roe v. City of Waterbury*, 542 F.3d 31, 41 (2d Cir. 2008). To do so, a plaintiff must show that: "(1) the issues of both proceedings are identical; (2) the relevant issues were actually litigated and actually decided in the prior proceedings; (3) there was a full and fair opportunity for the litigation of the issues in the prior proceeding, and (4) the issues were necessary to support a valid and final judgement on the merits." *Id.* Courts have "wide discretion to determine when offensive collateral estoppel should be applied." *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 80 (2d Cir. 2019) (internal quotation marks omitted).

Here, Plaintiffs fail to establish the second prong because the relevant issues were not

---

[8] Amazon contends that "Plaintiffs' antitrust standing necessarily depends on" the umbrella theory. (MTD Br. 10.) However, Plaintiffs deny reliance on that theory. (Opp'n 16.)

actually decided in *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975 (W.D. Wash. 2022). The relevant issue here is whether Plaintiffs have antitrust standing under *AGC*. However, in *Frame-Wilson*, the court analyzed whether plaintiffs had "direct-purchaser standing" as either (1) "direct purchasers from Amazon's co-conspirators" or (2) "direct purchasers from non-conspiring competitors . . . under an umbrella theory." 591 F. Supp. 3d at 983 (internal quotation marks omitted). Because the *Frame-Wilson* court found antitrust standing as direct purchasers of co-conspirators, the court explicitly declined to address the umbrella theory. *Id.* at 984 ("[T]he Court need not address Plaintiffs' standing under an umbrella theory."). Here, Plaintiffs specifically disclaims reliance on either theory. (*See* Opp'n 8 (alleging "injuries suffered by purchasers from non-conspiring platforms"); *id.* 16 ("Plaintiffs do not rely on umbrella standing[.]"). Further, *Frame-Wilson* analyzed direct-purchaser standing under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), with only one citation to *AGC* without analysis of the *AGC* factors. *Id.* at 983–84.[9] Because the relevant issue here regarding the *AGC* factors was not actually decided in *Frame-Wilson*, Amazon is not precluded from arguing that Plaintiffs lack antitrust standing under *AGC*.[10]

---

[9] The *AGC* factors are "analytically distinct" from the inquiry related to *Illinois Brick*. *Contant v. Bank of Am. Corp.*, 2018 WL 1353290, at *3 (S.D.N.Y. Mar. 15, 2018) (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476 (1982)); *see also Kloth v. Microsoft Corp.*, 444 F.3d 312, 323 (4th Cir. 2006) ("Although courts sometimes blend the indirect purchaser rule of *Illinois Brick*" and the requirements under *AGC*, the "question of which persons have been injured by an illegal overcharge" is "analytically distinct" from "which persons have sustained injuries too remote to give them standing"). Plaintiffs seem to agree and distinguish themselves from the plaintiffs in *Frame-Wilson*, and state "[t]hat is why Plaintiffs are seeking relief under state antitrust and consumer protection statutes." (Opp'n 10 n.6.) In *Frame-Wilson*, the court held that plaintiffs there "have established standing as direct purchasers of alleged antitrust co-conspirators," and stated that it "need not address Plaintiffs' standing under an umbrella theory." *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 984 (W.D. Wash. 2022). In this action, Amazon argues that, because Plaintiffs here are different from the *Frame-Wilson* Plaintiffs (who were direct purchasers of co-conspirators), "Plaintiffs' antitrust standing in this case therefore must depend on an umbrella theory." (MTD Br. 11 n.4.) However, this is a false dichotomy. For the reasons explained below, Plaintiffs have antitrust standing under *AGC* independent from the umbrella theory.

[10] Because I find that the issue of the *AGC* factors was not actually decided in *Frame-Wilson*, I decline to opine on whether the other prongs of issue preclusion were met.

**b.** Applying the *AGC* Factors

**i.** *Directness of the Injury*

I find that Plaintiffs sufficiently plead injuries that are "inextricably intertwined" with Amazon's PPR-scheme to satisfy the proximate-causation factor under *AGC*.  *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982).  In *McCready*, plaintiffs claimed that an insurance provider conspired with psychiatrists to exclude psychologists from receiving compensation under insurance plans, and thus refused to reimburse plaintiff for any treatment from a psychologist.  *Id.* at 469–70.  The Supreme Court held that the plaintiff had standing, even though she had not directly transacted with the conspiring defendants, because her injury was "inextricably intertwined" in their scheme.  *Id.* at 484.  "An injury is 'inextricably intertwined' when the defendants 'use the plaintiff's injury as the means, fulcrum, conduit, or market force to realize their illegal ends,' or when they 'corrupt a separate market in which a plaintiff is a participant in order to achieve their illegal ends.'"  *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 116 (2d Cir. 2018) (alterations adopted) (quoting *In re Aluminum Warehousing Antitrust Litig.* ("*Aluminum Warehousing*"), 833 F.3d 151, 160–61 (2d Cir. 2016)).  *McCready* was later described as "an exception to the market participant requirement in cases where a plaintiff was manipulated or utilized by a defendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical markets."  *Schwab*, 22 F.4th at 117 (internal quotation marks omitted and alteration adopted).  "*McCready* involved a direct relationship between the pocket-book harm to the plaintiff and the market advantage gained by the defendants, which was the very goal of the conspiracy."  *Id.*  Further, Plaintiffs' injuries need "not result from reduced competition" for Plaintiffs to have antitrust standing under *McCready*.  *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 116 (2d Cir. 2018).

Here, Plaintiffs' injuries of purchasing products at supra-competitive prices were "inextricably intertwined" to Amazon's conduct such that they satisfy the proximate-causation prong under *AGC*. Amazon's scheme regarding the TPS Fees (which were passed down as additional costs to customers), and the PPR (which precluded TPSs from offering lower product prices on non-Amazon Platforms), "corrupt[ed]" the "separate market" between Plaintiffs and Amazon's competitors "in order to achieve [Amazon's] illegal ends" for competitive advantage. *Harry*, 889 F.3d at 116 (internal quotation marks omitted). The FAC alleges that the PPR was a "means," (FAC ¶ 18), for Amazon to gain a "market advantage," *Schwab*, 22 F.4th at 117. Like the *McCready* plaintiff, Plaintiffs here were "participant[s] in the market that was the target of the alleged scheme and in which [Plaintiffs] directly suffered harm." *Aluminum Warehousing*, 833 F.3d at 159. Plaintiffs need not have bought a product from a co-conspirator to have antitrust standing. *See McCready*, 457 U.S. at 484. In short, Amazon engaged in the PPR scheme to hurt its competitors, and Plaintiffs paid the price.

Amazon's PPR-scheme distinguishes itself from other Second Circuit antitrust cases where plaintiffs lacked antitrust standing under *AGC* in several ways. First, the PPR "enriched" Amazon such that Amazon had a "financial stake" in consumers' transactions with non-Amazon retailers. *Schwab*, 22 F.4th at 116. The PPR created an economic context where Amazon was enriched by any price increase that occurred on non-Amazon platforms because the PPR required a commensurate price increase on the Amazon Platform. Thus, Amazon had a direct financial stake in the myriad transactions that consumers engaged in on non-Amazon platforms due to the TPS Fees, which included a percentage-based fee. Second, the PPR deprived the TPSs of the kind of independent decision-making discretion that would otherwise "snap the chain of causation linking Plaintiffs' injury to [Amazon's] misconduct." *Id*. Although Amazon did not

dictate the exact price for each Class Product, the FAC sets out a scheme where Amazon strictly monitored and enforced compliance with the PPR.  (FAC ¶¶ 55–71.)  The FAC, viewed in Plaintiffs' favor, demonstrates that Amazon had considerable influence over product prices and that "Amazon used [the PPR] to block third-party merchants from making truly independent pricing decisions."  *De Coster v. Amazon.com, Inc.*, No. C21-693, 2023 WL 372377, at *5 (W.D. Wash. Jan. 24, 2023) (internal quotation marks omitted).

A survey of relevant Second Circuit antitrust cases confirm distinguishable facts from the ones at issue here.  With regard to *American Express*, the Second Circuit held that merchant plaintiffs who did not accept American Express cards lacked antitrust standing.  *In re Am. Express Anti-Steering Rules Antitrust Litig.* ("*Am. Express*"), 19 F.4th 127, 134–35 (2d Cir. 2021).  There, American Express ("AmEx") had first raised the price for merchants who accepted AmEx cards, which caused AmEx's competitors to similarly raise the price for plaintiff merchants.  *Id.* at 140–41.  The Second Circuit held that plaintiffs failed to demonstrate the requisite proximate causation to confer antitrust standing because AmEx did not—and could not—raise the card fees for plaintiff merchants who did not accept AmEx cards.  *Id.*  However, *American Express* is distinguishable because there was no enforceable policy or agreement, like the PPR here, that connects AmEx's actions with those of its competitors.  AmEx and its competitors acted independently from each other.  In contrast, the PPR here required the product prices on the Amazon Platform to be cheaper or equal to the prices of the same products sold on competitors' platforms.  The crucial factual distinction is the enforcement mechanism of the PPR that sets a floor for prices pegged to the product price listed on the Amazon Platform.  Although Amazon, unlike AmEx, did not set or raise the product prices, Amazon's PPR creates a connection between Amazon and its competitors to such an extent that the TPSs are severely

restricted from making truly independent decisions on pricing their products.  In other words, if

the TPSs made independent pricing decisions they may have been in violation of their respective

PPRs with Amazon, something they were unable to do given the fact that much of TPSs' revenue

were generated almost exclusively on the Amazon Platform.  (*See* FAC ¶ 6.)

In *Schwab*, the Second Circuit considered the London Interbank Offered Rate

("LIBOR"), which was a benchmark interest rate that acts as an index for financial instruments

such as bonds and exchange-traded derivatives.  *Schwab Short-Term Bond Mkt. Fund v. Lloyds

Banking Grp. PLC* ("*Schwab*"), 22 F.4th 103, 109–10 (2d Cir. 2021).  There, plaintiffs "held

LIBOR-based bonds issued by third parties" and claimed antitrust injury when bank defendants

manipulated the LIBOR.  *Id.* at 111.  The Second Circuit held that the bondholders lacked

antitrust standing because a third party's decision "to incorporate LIBOR as a term in a financial

instrument could be made without any connection to the actions" of the defendant banks.  *Id.* at

116.  Notably, the Second Circuit explained that the third party's decision to incorporate LIBOR

"in no way enriched the [bank defendants], who had no financial stake in the [third party]

transactions whatsoever."  *Id.*  Here, in contrast, the alleged violator of the antitrust laws is

directly enriched and has a substantial financial stake in the transactions between Plaintiffs and

the TPSs due to the various percentage-based fees that Amazon collects from the TPSs.  The

product price that the TPSs set in non-Amazon platforms is directly impacted by the price set on

the Amazon Platform.  The higher the product price, the more money Amazon collects through

its referral fees and other fees that TPSs are required to pay.  Indeed, it was not a third-party

action or some market condition that tied Amazon to its competitors and consumers' transactions

with those competitors; rather, it was the PPR.  Amazon has a financial stake in this scheme due

to its PPR, which was a required condition for TPSs to sell on the Amazon Platform.

*Platinum & Palladium* is instructive. *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242 (2d Cir. 2023). There, the Second Circuit found antitrust standing in some plaintiffs but not others. First, the Second Circuit held that plaintiffs, who allegedly sold platinum and palladium at supra-competitive prices due to defendants' conduct, lacked antitrust standing. *Id.* at 259. The Circuit emphasized that the "independent decision" to adopt certain benchmark prices was done by third parties who chose to peg their transactions to the benchmark prices. *Id.* at 260. At a glance, this seems to doom Plaintiffs' claims because the TPSs made the "independent decision" to tie their product prices in the Amazon Platform to those in non-Amazon retailer platforms by agreeing to the PPR. However, Plaintiffs' allegations, construed collectively, plausibly allege that the TPSs "needed access to the Amazon Platform for their business to survive" due to Amazon's outsized market power. (FAC ¶¶ 34–37.)

Although the Second Circuit has stated that "[m]arket dominance does not determine whether" there is a direct relation between a defendant's conduct and a plaintiff's injury under the first-step rule, *Platinum & Palladium*, 61 F.4th at 264, I find that market dominance is relevant here when combined with the PPR because it provides the context for the kind of market influence that results in "inextricably intertwined" injuries under *McCready*. Similarly, although market dominance, by itself, does not confer a relationship that constitutes direct injury under *AGC*, it can provide the context that informs a court's determination whether a third party truly had "independent" decision-making ability in entering into certain agreements. In other words, market dominance is not a "proxy for directness of injury," *id.*, but can provide relevant context for the analysis of proximate causation.

Indeed, a defendant's role in the market was found relevant in *Platinum & Palladium*, where the Second Circuit found antitrust standing for plaintiffs who sold platinum and palladium

futures contracts at artificial prices. *Id.* at 263. These exchange plaintiffs were "harmed at the first step" because "the defendants manipulated the futures market to profit from futures contracts transactions, while the Exchange Plaintiffs simultaneously lost money through futures contracts transactions in the same market." *Id.* In finding proximate causation, the Court rejected the argument that the exchange plaintiffs "did not transact with any defendant," and emphasized that "[f]utures trading is a zero-sum game," and that defendants sought their own profits. *Id.* (internal quotation marks omitted). Similarly, the PPR inexorably tied Amazon to its competitors so as to deprive those competitors of certain economic competitive advantages. TPSs were unable to have more competitive prices on non-Amazon platforms for fear of violating the PPR and the accompanying repercussions from such violations. In the competition for consumers, Amazon's PPR created a "zero-sum game" of sorts, such that even if Plaintiffs here "did not transact" directly with Amazon, the PPR influenced the overall online retail market in such a way that Amazon benefits while the consumer—who must pay supra-competitive prices regardless of whether it is on the Amazon Platform or another platform—loses. The FAC sufficiently alleges that the Plaintiffs are injured due to the bind in which TPSs were placed by the PPR. On the one hand, if TPSs lower the product price on Amazon, they inevitably decrease their revenue, even as they must give percentage-based fees to Amazon. (FAC ¶¶ 38–44.) On the other hand, if TPSs increase the product price on Amazon, they must increase the price on other platforms because of the PPR, further risking a loss of sales to their competitors, including to Amazon who also acts as a direct competitor. (*Id.* ¶¶ 45–49.) The FAC accordingly plausibly alleges that Amazon's PPR affects the online retail market in a way where Plaintiffs were "harmed at the first step." *See Platinum & Palladium*, 61 F.4th at 263.

Finally, consider *In re Aluminum Warehousing Antitrust Litigation*, where the Second

Circuit held that plaintiffs' alleged injuries are too indirect to confer antitrust standing. No. 21-643, 2023 WL 7180648, at *2 (2d Cir. Nov. 1, 2023) (summary order). Plaintiffs there alleged that they "purchased aluminum from non-conspiring third parties at prices that incorporated an inflated benchmark component." *Id.* In citing *Schwab*, the Court again emphasized that the decision to incorporate the benchmark could be made "without any connection" to defendants' actions "and in no way enriched" defendants. *Id.* (internal quotation marks omitted). The Court noted that, to the extent plaintiffs were "'forced' to incorporate the benchmark price, they were forced to do so by their third-party counterparts and not by" defendants. *Id.* Here, however, it was not Amazon's competitors who forced TPSs to peg their product prices; it was Amazon who required agreement to the BSA and the PPR, which in turn required that the product prices be tied in such a way that would provide Amazon with the advantage of competitive product prices.

Amazon argues that Plaintiffs "are neither direct nor indirect purchasers from Amazon's store." (MTD Br. 8.) As an initial matter, "the infliction of a derivative injury does not always render an antitrust plaintiff's injury too indirect under the efficient-enforcer test." *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 65 (2d Cir. 2019) (citation omitted). If the "ultimate goal of the anticompetitive scheme to harm competitors was to charge the consumers higher prices," then injury can be sufficiently direct. *Id.* (citing *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 682 (2d Cir. 2009)). Plaintiffs' allegations as a whole show that Amazon's goal for the PPR was to gain a competitive advantage over competitors, both its retail competitors and first-party competitors. (*See* FAC ¶ 18 ("The Price Parity Restriction was a means by which Amazon weaponized its millions of third-party sellers against competing e-commerce platforms' efforts to gain market share by charging third-party sellers lower fees than Amazon.").)

Amazon also argues that alleged injuries are too attenuated due to the "independent pricing decisions" of Amazon's retailer competitors.  (*See* MTD Br. 2 ("independent pricing decisions of Walmart, Sephora . . ."); 12 ("there are numerous steps and intervening factors— including the independent pricing decisions of Walmart and Sephora").)  However, Amazon misunderstands Plaintiffs' claims.  Neither Amazon nor its competitors is accused of antitrust violations because they set supra-competitive product prices.  It is the TPSs who set the price, but, as I have explained, they were heavily restricted in terms of decision-making power by the terms of the PPR, a requirement by Amazon as a condition to use the Amazon Platform.  (*See* Opp'n 12 ("Plaintiffs' injuries stem directly from the *pricing decisions made by third-party sellers* subject to the PP Restriction that sold both on the Amazon Platforms and on and through competing platforms, such as Walmart, eBay, and Sephora." (emphasis in original)).)  In other words, the PPR prevented the TPSs (and not other retailers) from exercising independent pricing decisions, and therefore the causal chain is not too attenuated to require dismissal under *AGC*. *De Coster*, 2023 WL 372377, at *5 ("Amazon uses its [PPR] policies to block third-party merchants from making truly independent pricing decisions." (internal quotation marks omitted)).

Amazon next argues that I should reject Plaintiffs' "umbrella theory" as the basis for antitrust standing.  (MTD Br. 10–12.)[11]  The umbrella theory confers antitrust standing to "a consumer who dealt with a non-cartel member to pursue antitrust claims against cartel members who rigged the market as a whole."  *Schwab*, 22 F.4th at 117 (citing *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 778 (2d Cir. 2016)).  Amazon is correct that the Second Circuit in *Schwab*

---

[11] Amazon claims that any alleged antitrust standing "must depend on an umbrella theory" because Plaintiffs seek to distinguish themselves from the plaintiffs in *Frame-Wilson*, where the court found antitrust standing through the co-conspirator exception in *Illinois Brick* and did not address umbrella standing.  (MTD Br. 11 n.4.)

rejected the umbrella theory, at least as applied to that case.  *Id.* at 117 ("[T]he unique nature of the LIBOR conspiracy makes umbrella standing particularly inappropriate here.").  Although the Second Circuit acknowledged that it has "never adopted [the umbrella] theory of antitrust standing" and expressed reservation about the umbrella theory, *id.*, it cannot be said that the Second Circuit expressly rejected umbrella theory in all circumstances.  In any event, Plaintiffs specifically disclaim any reliance on the umbrella theory.  (Opp'n 3 ("Nor are Plaintiffs relying on the umbrella theory.").)  Plaintiffs instead argue that the umbrella theory is not applicable here because "the market participant making the decision at what price to sell the products at issue is an entity other than the non-conspiring retailer."  (*Id.* at 16 (emphasis omitted).)  I therefore reject any arguments to the extent they are based on the so-called umbrella theory.

In sum, I find that Plaintiffs' injuries were proximately caused by Amazon and satisfies the first factor under *AGC*.

### ii.   *Other AGC Factors*

Because Amazon's motion to dismiss focuses only on the *AGC* factor of proximate causation, any potential arguments regarding the other *AGC* factors are waived.  *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 n.5 (2d Cir. 2018) ("Defendants did not raise this argument in their motion to dismiss the amended complaint and it is therefore waived.").  Even still, I analyze the remaining *AGC* factors because the weight of each factor depends on the particular circumstances of each case.  *See Am. Express*, 19 F.4th at 138; *see also Platinum & Palladium*, 61 F.4th at 261–63 (analyzing all *AGC* factors even after holding that the alleged injuries were too indirect to establish antitrust standing).

<u>Existence of More Direct Victims</u>.  The second *AGC* factor concerns "the existence of more direct victims of the alleged conspiracy."  *AGC*, 459 U.S. at 545.  The relevant inquiry is

into "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement.'" *Am. Express*, 19 F.4th at 141 (internal quotation marks omitted).  Courts consider "whether denying the plaintiff a remedy on the basis of its allegations is likely to leave a significant antitrust violation undetected or unremedied." *Id.* (internal quotation marks omitted and alterations adopted).  "Although the existence of more-motivated plaintiffs is not dispositive, the presence of plaintiffs who are better situated to vindicate the antitrust laws is relevant to this second factor." *IQ Dental Supply*, 924 F.3d at 66.

        This factor weighs in favor of antitrust standing.  Plaintiffs are consumers who paid supra-competitive prices for products from non-Amazon online retailers.  No other consumer is a more "direct" victim of the PPR-scheme.  Although the TPSs were certainly injured by Amazon's PPR-scheme, the direct injury of the alleged conduct here arises from the supra-competitive prices that consumers, like Plaintiffs, had to pay.  In many ways, consumers of non-Amazon online retailers, like Plaintiffs, are the most direct victims, more so than consumers of the Amazon Platform.  This is because the PPR created the floor of the product price; the lowest (or, tied for lowest) price for a product can be found on the Amazon Platform.  Consumers of Amazon's competitors would pay, at best, the product price identical to the one on the Amazon Platform, and in other cases, higher prices.  Theoretically, a consumer who purchases products exclusively on the Amazon Platform will always pay the lowest price for a product if the product's TPS uses Amazon as the retailer.  In contrast, a consumer who purchases products exclusively from Amazon's retailer competitors may pay higher product prices.  Regardless of how Amazon's competitors, the TPSs, or other parties may have been affected by Amazon's scheme, "the plaintiffs are also significantly motivated due to their natural economic self-interest

in paying the lowest price possible." *DDAVP*, 585 F.3d at 689 (internal quotation marks omitted).

Speculative Damages.  The third *AGC* factor considers the degree of speculation of a claim. *AGC*, 459 U.S. at 542. This factor involves an inquiry into whether there is "a high degree of speculation in a damages calculation." *IQ Dental Supply*, 924 F.3d at 66–67.

It is unclear, based on the FAC and the motion-to-dismiss briefs before me, whether there is a high degree of speculation.  On the one hand, a damages calculation may be speculative because it would involve analyzing the market if the PPR had never existed.  *See, e.g.*, *Schwab*, 22 F.4th at 119 ("Plaintiff's theory would require the court to speculate about how the third-party sellers would have factored a non-suppressed LIBOR into the transaction.").  On the other hand, "some degree of uncertainty stems from the nature of antitrust law," and the alleged wrongdoer is "generally require[d]" to "bear the risk of the uncertainty which his own wrong has created." *Platinum & Palladium*, 61 F.4th at 265 (internal quotation marks omitted).  In any event, "the Supreme Court has noted that the 'potential difficulty in ascertaining and apportioning damages is not . . . an independent basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects' because this factor is a touchstone for 'the proximate-cause requirement.'" *Am. Express*, 19 F.4th at 142 (quoting *Lexmark*, 572 U.S. at 135).  I accordingly find this factor to be neutral.

Duplicative Damages.  The fourth *AGC* factor emphasizes "avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *AGC*, 459 U.S. at 543–44.  "The concern arises when the damages to which the plaintiff lays claim are exactly the same damages other parties could have claimed." *Am. Express*, 19 F.4th at 142 (internal quotation marks omitted and alterations adopted).

This factor slightly weighs in favor of antitrust standing.  Admittedly, there was "no intermediary" between the first-step consumers who purchased products from Amazon's competitors.  *Platinum & Palladium*, 61 F.4th at 265.  Even though the Plaintiffs did not purchase directly from Amazon, the PPR inflicts a direct harm to Plaintiffs who paid supra-competitive prices.  Undoubtedly, the consumers who purchased directly from Amazon may have some injuries resulting from the PPR that overlap with those that Plaintiffs purport to have suffered.  However, as I explained, consumers on the Amazon Platform paid for the "floor" product price, while Plaintiffs paid for the "ceiling" product price.  Although there may be overlap, these are not "exactly the same damages."  *IQ Dental Supply*, 924 F.3d at 67.  The FAC and the briefs before me also discuss other suits against Amazon related to the PPR, so it is unclear how those claims may affect potential duplicate recovery and damage apportionment.  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 780 (2d Cir. 2016) (referencing government investigations and suits and related proceedings in other countries that make it "wholly unclear . . . how issues of duplicate recovery and damage apportionment can be assessed").  In any event, this factor is non-dispositive.  *Am. Express*, 19 F.4th at 143 ("In *AGC* itself, the fourth factor was non-dispositive.").

In sum, I find that the multi-factor balancing test under *AGC* weighs in favor of establishing antitrust standing.  This result is particularly appropriate in light of the principles that "[t]here are no heightened pleading requirements for antitrust cases," *Com. Data Servers*, 2002 WL 1205740, at *2 (citing *Todd*, 275 F.3d at 198), and because "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly," *Todd*, 275 F.3d at 198 (quoting *Hosp. Bldg. Co.*, 425 U.S. at 746).

### 2.  Statute of Limitations

The primary argument regarding the statute of limitations concerns *American Pipe and Construction Co. v. Utah*, 414 U.S. 538 (1974).  For Plaintiffs' arguments to prevail, I must find both *American Pipe* tolling and cross-jurisdictional tolling for each state claim.  *See Chavez* v. *Occidental Chem. Corp.*, 933 F.3d 186, 198 (2d Cir. 2019) ("Despite some important similarities, *American Pipe* tolling and cross-jurisdictional tolling are different such that adoption of the former does not necessarily imply adoption of the latter.").

#### a.  *American Pipe* Tolling

First, I must determine whether *American Pipe* applies.  The First Amended Complaint asserts that *American Pipe* tolling applies "as a result of the filing of the Class Action Complaint" in *Frame-Wilson*.  (FAC ¶ 126.)  Amazon cites *China Agritech Inc. v. Resh*, 584 U.S. 732, 735–36 (2018), to argue that *American Pipe* does not revive an otherwise untimely class action that was filed after class certification was denied in a prior class action.  (MTD Br. 36.)  However, *China Agritech* is inapposite as Amazon concedes that, when the First Amended Complaint in this action was filed, "a class certification motion [in *Frame-Wilson*] ha[d] not yet been filed or decided."  (*Id.*)  Amazon cites no opinion holding that a subsequently filed class action cannot benefit from *American Pipe* tolling when a class-certification motion was not even filed in the prior class action.  *See Hart v. BHH, LLC*, No. 15-CV-4804, 2018 WL 5729294, at *2 (S.D.N.Y. Nov. 2, 2018) ("The linchpin of the *China Agritech* decision was that plaintiffs there brought the action *after* the denial of class certification in the prior action." (emphasis in original)).

Indeed, courts in this Circuit have applied *American Pipe* tolling to subsequent class actions when the issue of class certification was not decided in the prior class action.  *See, e.g.*,

*Vincent v. Money Store*, 304 F.R.D. 446, 457 (S.D.N.Y. 2015) (applying *American Pipe* tolling

to class action where class-certification motion in prior suit "had not yet been filed, let alone

decided"); *Boyd v. J.E. Robert Co., Inc.*,  No. 05-CV-2455, 2008 WL 4415253, at *2 (E.D.N.Y.

Sept. 24, 2008) (applying *American Pipe* tolling to class action "notwithstanding [plaintiffs']

failure to await determination of class certification in [prior class action]"); *In re Issuer Plaintiff*

*Initial Pub. Offering Antitrust Litig.*, No. 00-CV-7804, 2002 WL 31132906, at *4 (S.D.N.Y.

Sept. 25, 2002) ("Since there was not a 'definitive' determination of class certification in the

First Action, the tolling doctrine of *American Pipe* does indeed apply and plaintiffs may proceed

with this [class] action.").  Courts in other jurisdictions have done the same  *See, e.g.*, *In re Dairy*

*Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-CV-3690, 2015 WL 3988488, at *30 (N.D.

Ill. June 29, 2015) ("The Court sees no reason why *American Pipe*'s tolling principle should

apply only to successive individual actions, and not to successive class actions."); *McKowan*

*Lowe & Co. v. Jasmine, Ltd.*, 295 F.3d 380, 389 (3d Cir. 2002) ("[W]e see no good reason why

class claims should not be tolled where the district court had not yet reached the issue of the

validity of the class.").

　　　　The rationale for *American Pipe* tolling for subsequent individual actions would also

apply for subsequent class actions.[12]  In *WorldCom Securities Litigation*, the Second Circuit

held, in relevant part, that *American Pipe* tolling extended to class members who filed individual

suits before class certification was resolved.  *In re WorldCom Sec. Litig.*, 496 F.3d 245, 254 (2d

Cir. 2007).  The Circuit reasoned that doing so "would not undermine the purposes of statutes of

---

[12] *See also Betances v. Fischer*, 403 F. Supp. 3d 212, 223–27 (S.D.N.Y. 2019) (examining policy reasons why *American Pipe* tolling should apply to successive class action where class certification was not resolved in prior class action), *vacated on other grounds*, 707 F. Supp. 3d 279 (S.D.N.Y. 2023), *vacated*, 2023 WL 11905240 (S.D.N.Y. Dec. 28, 2023), *and superseded*, 2024 WL 182044 (S.D.N.Y. Jan. 17, 2024), *on reconsideration*, 2024 WL 3848485 (S.D.N.Y. Aug. 16, 2024).

limitations to give the benefit of tolling to all those who are asserted to be members of the class for as long as the class action purports to assert their claims." *Id.* at 255. The Circuit also noted that the Supreme Court had "repeatedly emphasized" the fact that "the initiation of a class action puts the defendants on notice of the claims against them." *Id.* (citing *Am. Pipe*, 414 U.S. at 544–55). Despite a circuit split on this issue, the majority of circuits that have decided this issue—of whether *American Pipe* tolling applies to subsequent individual actions when class certification of a prior class action was not yet resolved—have agreed with the Second Circuit. *See In re Turkey Antitrust Litig.*, No. 19-C-8318, 2024 WL 3848560, at *2 (N.D. Ill. Aug. 16, 2024) (describing circuit split). The rationale undergirding these circuits' decisions relies on the fact that defendants have already been put on notice as to those claims. *See Rowe v. Papa John's Int'l, Inc.*, No. 23-CV-2082, 2024 WL 3925411, at *7 (N.D. Ill. Aug. 23, 2024) ("The rationale largely turns on the lack of surprise."). Defendants are surely put on notice to subsequent class actions based on the filing of the previously filed class action. Amazon does not offer any arguments regarding why these policy considerations relevant to subsequent individual actions are not applicable to subsequent class actions.

Whatever the policy considerations that may weigh against such a finding, the Second Circuit noted that "it was not the purpose of *American Pipe* either to reduce the number of suits filed, or to force individual plaintiffs to make an early decision whether to proceed by individual suit or rely on a class representative." *In re WorldCom*, 496 F.3d at 256. These considerations do not distinguish between individual actions and class actions that are subsequently filed. I join my colleagues in this Circuit who found that *American Pipe* tolling can apply to a successive class action when the issue of class certification was not resolved when the subsequent class

action began.[13]  Accordingly, *American Pipe* tolling applies here.

**b.**  Cross-Jurisdictional Tolling

The next analysis is whether cross-jurisdictional tolling applies.  Cross-jurisdictional tolling occurs where a state's statute of limitations is tolled "by the pendency of a class action in another jurisdiction."  *Chavez v. Occidental Chem. Corp.*, 933 F.3d 186, 189 (2d Cir. 2019). Courts in this Circuit are split concerning how a federal court should analyze whether a state would adopt cross-jurisdictional tolling in the absence of state court decisions settling the issue. Some courts interpret each state's respective laws to determine whether that state would recognize cross-jurisdictional tolling.  *See, e.g.*, *Soward v. Deutsche Bank AG*, 814 F. Supp. 2d 272, 281–82 (S.D.N.Y. 2011) (stating that "[p]redicting how New York courts would rule on the issue of cross-jurisdictional tolling would be difficult" before declining to "say that New York would adopt cross-jurisdictional tolling"); *Adams v. Deutsche Bank AG & Deutsche Bank Sec., Inc.*, No. 11-CV-1893, 2012 WL 12884365, at *5 (S.D.N.Y. Sept. 24, 2012) (citing *Soward*, 814 F. Supp. 2d at 282), *aff'd sub nom. Adams v. Deutsche Bank AG*, 529 F. App'x 98 (2d Cir. 2013); *Wilchfort v. Knight*, 307 F. Supp. 3d 64, 83 (E.D.N.Y. 2018) (declining to read cross-jurisdictional tolling into Florida law).  Other judges seem to create a presumption against cross-jurisdictional tolling based on policy reasons.  "Judges in this district have declined to recognize cross-jurisdictional tolling under state law, because such tolling can be applied only if it is clearly recognized by authoritative state court decisions."  *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 312 (S.D.N.Y. 2014), *aff'd sub nom. SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173 (2d Cir. 2016); *see also Vincent v. Money Store*, 915 F. Supp. 2d 553, 569–70 (S.D.N.Y. 2013) (refusing to adopt

---

[13] Indeed, as of September 18, 2025, the issue of class certification in *Frame-Wilson* is still pending.

cross-jurisdictional tolling based on policy reasons).  According to this presumption, if an authoritative state court has not "clearly recognized" cross-jurisdictional tolling, a federal court will decline to recognize it.  Federal courts may also decline to weigh in on these issues to prevent the risk of out-of-state litigants attempting another bite of the class-action apple after losing in a federal class action.  *See Famular v. Whirlpool Corp.*, No. 16-CV-944, 2017 WL 2470844, at *8 (S.D.N.Y. June 7, 2017) (describing "docket-control concerns" and a potential "incentive for out-of-state plaintiffs to bring otherwise untimely claims in New York courts").

In contrast, other courts have come out the other way and adopt a presumption in favor of cross-jurisdictional tolling based on the underlying reasoning of *American Pipe*.  *In re Libor-Based Fin. Instruments Antitrust Litig.* ("*LIBOR*"), No. 11-MDL-2262, 2015 WL 4634541, at *129 (S.D.N.Y. Aug. 4, 2015) ("Absent state-specific considerations, we believe the best prediction is that a state would recognize cross-jurisdictional tolling."), *amended by*, 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015).  The underlying policy rationales include, among other things:  that defendants have fair notice regarding those claims; to ensure class members act reasonably in relying on the class action; and that individual suits are disfavored when a class action is appropriate.  *Id.* at *128 (citing *Am. Pipe*, 414 U.S. at 550–51).  Further, rejecting cross-jurisdictional tolling could incentivize plaintiffs to file duplicative "placeholder" suits throughout the state jurisdictions while their other class action is pending.  *Pac. Life Ins. Co. v. US Bank Nat'l Ass'n*, 636 F. Supp. 3d 366, 398 (S.D.N.Y. 2022) (citations omitted).  In fact, it is the "duty" of the federal court "to predict accurately what the high court of a particular state would do in the same circumstance."  *LIBOR*, 2015 WL 4634541, at *130.  Indeed, a federal court's decision to dismiss a case that a state court would otherwise keep is "equally" a failure of that duty as when federal courts sustain cases that state courts would dismiss.  *Id.*  It is clear that

courts in this Circuit disagree on the best approach to analyze whether a state would recognize cross-jurisdictional tolling.

I agree with the well-reasoned decision in *LIBOR*, and find that cross-jurisdictional tolling applies, "[a]bsent state-specific considerations." *LIBOR*, 2015 WL 4634541, at *129. In other words, there is a rebuttable presumption that states that have adopted *American Pipe* tolling would also adopt cross-jurisdictional tolling. As discussed, Amazon has had fair notice about potential antitrust claims based on the PPR. Even though the plaintiffs in *Frame-Wilson* are different than the Plaintiffs here, both allege antitrust injuries in supra-competitive product prices stemming from the PPR-scheme, thereby providing Amazon notice of the substance and nature of the antitrust claims. With regard to the issue of docket control, to rule otherwise could motivate plaintiffs to file class actions in all state jurisdictions for fear of running the statute of limitations. Such a risk of the high number of filings would be contrary to the purpose of class actions as an efficient means for litigation. I thus presume that cross-jurisdictional tolling applies absent contrary state authority.

### 3. Rule of Reason

The First Amended Complaint alleges that Amazon's PPR, regardless of whether it is deemed a horizontal or vertical agreement, was a price-fixing agreement in violation of state antitrust laws. (FAC ¶ 16.) Plaintiffs allege that the PPR constituted both a "per se, horizontal agreement in restraint of trade" and an "unreasonable vertical agreement in restraint of trade under the rule of reason." (*Id.* ¶¶ 17–18.)

Amazon first argues that Plaintiffs fail to allege an unlawful per se horizontal agreement. (MTD Br. 23–26.)[14] Amazon points out that two federal courts have declined to evaluate

---

[14] Amazon argues that "federal case law is dispositive of" whether Plaintiffs have alleged an unlawful per se

Amazon's various agreements with TPSs under the per se standard.  (*Id.* at 24.)  Amazon also asserts that courts that have considered similar most-favored-nation provisions involving competitive prices for consumers have found that they do not violate antitrust laws as a matter of law such that the per se standard applies.  (*Id.* at 25.)

I agree with Amazon that Plaintiffs have failed to allege a per se violation based on a horizontal agreement.  The PPR-scheme, which involves a complex relationship among Amazon, its competitors, and the TPSs by way of a "hybrid arrangement" between Amazon and its competitors, presents an issue of factual complexity that does not lend itself to a per se standard without need to show anticompetitive effects in a relevant market.  *Frame-Wilson*, 591 F. Supp. 3d at 987; *accord Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41 (2018).  Other courts that have reviewed a similar hybrid arrangement have also declined to impose a per se standard.  *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 375 (S.D.N.Y. 2022) ("The Court concludes that this hybrid relationship between Google and Facebook is predominately vertical and properly scrutinized under the rule of reason."); *2238 Victory Corp. v. Fjallraven USA Retail*, 2021 WL 76334, at *5 (S.D.N.Y. Jan. 8, 2021) ("Because the Complaint describes a mixed vertical and horizontal relationship between Fjallraven and Netrush, any agreement between them is scrutinized under the rule of reason and is not categorized as *per se* unlawful under the Sherman Act.").  Accordingly, Plaintiffs' allegations of a horizontal agreement are subject to the rule of reason.

The next inquiry is whether Plaintiffs have alleged a per se violation based on a vertical

---

violation.  (MTD Br. 23 n.12.) ("Although Plaintiffs bring only state law claims, they rely almost exclusively on federal precedent for their *per se* allegations.  They likewise do not identify specifically *which* state antitrust laws recognize *per se* violations." (citations omitted)).  In opposition, Plaintiffs cite only to federal case law in claiming a per se horizontal agreement.  (Opp'n 18–19.)  Accordingly, I analyze Plaintiff's allegations of a per se horizontal agreement under federal law only.

agreement.  Plaintiffs argue that the PPR is a vertical price-fixing agreement, and thus a per se

violation of the antitrust statutes of the following eight states:  Hawaii, Illinois, Maryland,

Minnesota, New Hampshire, Nevada, Tennessee, and West Virginia.  (Opp'n 19.)[15]  Each of

these state antitrust statutes stands in contrast to Section 1 of the Sherman Act because they

prohibit both horizontal and vertical agreements to fix prices.  (*Id.* at 19–20.)  In reply, Amazon

asserts that (1) Illinois does not find vertical agreements to be a per se violation, and (2) the

remaining states would apply the Supreme Court's holding that "[v]ertical price restraints are to

be judged according to the rule of reason," *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,

551 U.S. 877, 907 (2007).  (Reply 13–15.)  Accordingly, each state law will determine whether

the PPR constitutes a vertical agreement subject to the per se standard.

### 4.  Analysis of State Law Claims

I now turn to the claims that depend on state law.  As discussed, Amazon moves to

dismiss Plaintiffs' claims under the laws of 29 states.  (*See generally* MTD Br.)  Amazon makes

the following arguments for why the state law claims should be dismissed:  (1) Plaintiffs lack

antitrust standing under the laws of 20 states that have adopted *AGC*, either directly or through a

harmonization of its state antitrust law with the federal law; (2) Plaintiffs lack antitrust standing

under the laws of seven states for other reasons; (3) Plaintiffs have failed to plead the substantive

elements of an antitrust claim; (4) Plaintiffs fail to allege an unlawful per se violation; (5) a

catch-all category for other claims under state law; and (6) Plaintiffs' claims are time barred.

The role of a federal district court adjudicating a state law claim is to "ascertain from all

---

[15] Although Section IV of Plaintiffs' opposition brief includes Kansas in the heading, (Opp'n 19), and Mississippi in
the conclusion, (*id.* at 22), Amazon notes that the brief does not cite authority under those states' laws and that I
therefore need not "address the appropriate standard" for the claims under those states' laws, (Reply 13 n.7).  I agree
and therefore do not address whether a vertical agreement is subject to the per se standard under Mississippi and
Kansas law; however, I address the laws in Mississippi and Kansas under the rule of reason below.

the available data what the state law is and apply it rather than to prescribe a different rule."

*West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) (citing *Erie Railroad Co. v. Tompkins*,

304 U.S. 78 (1938)).  To do so, the court "look[s] to the state's decisional law, as well as to its

constitution and statutes."  *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 297 (2d Cir.

2000).  When state law is not settled on an issue, the court "is obligated to 'carefully predict how

the state's highest court would resolve the uncertainty or ambiguity.'"  *Id.* (alterations adopted)

(quoting *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994)).  The court

must give the "fullest weight" to the pronouncements of the state's highest court while giving

"proper regard" to the rulings of the state's lower courts.  *Id.* (internal quotation marks omitted).

Amazon contends that Plaintiffs have failed to allege antitrust standing under the laws of

27 states.  (MTD Br. 14–19; *see also id.* at 22–23.)  Among these, 20 states have adopted the

*AGC* test, citing state and federal court decisions[16] as well as state harmonization laws[17].  (MTD

Br. 14–20.)  Amazon also claims that seven states independently require proximate causation

akin to the first factor in *AGC*.[18]  (*Id.* at 20–22.)  Separately, New Hampshire would both apply

*AGC* and also independently require proximate causation.  (*Id.* at 22.)  Finally, three states

allegedly prohibit non-purchaser standing.[19]  (*Id.* at 22.)  Notably, Plaintiffs dispute that Maine,

New Hampshire, New York, North Carolina, North Dakota, West Virginia, and Wisconsin have

adopted or would adopt the *AGC* factors.  (Opp'n 17.)  However, Plaintiffs do not dispute that

---

[16] Among these, 13 states have allegedly adopted *AGC*:  Connecticut, Illinois (Antitrust Act), Iowa, Maine, Maryland, Michigan, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, South Dakota, and Wisconsin.  (MTD Br. 14.)

[17] Among these, nine states, with some overlap with states that allegedly adopted *AGC*, have allegedly required their state antitrust laws to be harmonized with federal antitrust law:  Hawaii, Iowa, Kansas, Nebraska, Nevada, New Mexico, Oregon, Rhode Island, and West Virginia.  (MTD Br. 17.)

[18] The states are Arkansas, Florida, Illinois (Deceptive Trade Practices), Minnesota, Mississippi, North Carolina, and Utah.

[19] The states are Arizona, North Dakota, and Vermont.

the following 13 states apply the *AGC* factors:  Connecticut, Hawaii, Illinois, Iowa, Kansas, Maryland, Michigan, Nebraska, Nevada, New Mexico, Oregon, Rhode Island, and South Dakota. Because I held that Plaintiffs have antitrust standing under *AGC*, I reject Amazon's arguments related to *AGC* under the laws of these 13 states.

Amazon also contends that most of Plaintiffs' claims are limited by different states' statute of limitations.  (MTD Br. 31.)  First, Amazon argues that various antitrust and consumer protection claims in five states are completely time barred based on a three-year statute of limitations, and that no tolling doctrine applies.[20]  (*Id.* at 32.)  Second, Amazon contends that antitrust claims in 14 states are limited based on a four-year statute of limitations.[21]  (*Id.* at 38.) Third, Amazon contends that claims under Missouri law are limited based on a five-year statute of limitations.  (*Id.* at 39.)  Finally, Amazon maintains that claims in three states are limited by a six-year statute of limitations.[22]  (*Id.* at 40.)  Plaintiffs concede that (1) the "claim under the Mississippi Antitrust Statute is untimely," (2) the "claim under Arizona law is limited to purchases between November 8, 2018 and March 2019," (3) and that the "claim under Missouri law is limited to purchases between November 8, 2017 and March 2019."  (Opp'n 30.)

As to the remaining claims, Plaintiffs argue that the *Frame-Wilson* Action triggered cross-jurisdictional tolling under *American Pipe*.  (*Id.* at 30–31.)  Plaintiffs further contend that the various states have expressly adopted cross-jurisdictional tolling or would likely adopt cross-jurisdictional tolling.  In reply, Amazon points out that Plaintiffs fail to cite any state court decision in 13 of the states adopting cross-jurisdictional class action tolling.  (Reply 17.)

---

[20] These are consumer-protection claims in Illinois and New Hampshire and antitrust claims in Kansas, Mississippi, and Tennessee.

[21] The states are Arizona, Connecticut, Florida, Hawaii, Illinois, Iowa, Maryland, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, and Oregon.

[22] The states are Maine, Vermont, and Wisconsin.

Amazon requests that I decline to extend cross-jurisdictional tolling to states that have not yet considered it.  (*Id.*)  However, as I have explained, I find that cross-jurisdictional tolling would apply absent state-specific considerations.[23]  *See supra* IV.B.2.

I address Amazon's arguments regarding antitrust standing, statute of limitations, the per se standard, and miscellaneous arguments for each state below.

> **a.** Arizona[24]

Amazon does not argue that Arizona courts would adopt the *AGC*, and instead argues that Plaintiffs lack antitrust standing under Arizona law because non-purchasers do not have standing.  (MTD Br. 22.)  Amazon cites to a federal court decision *Oliver v. American Express Co.*, No. 19-CV-566, 2021 WL 386749, at *7 (E.D.N.Y. Feb. 1, 2021), which in turn cited an Arizona trial court decision *Consiglio-Tseffos v. Visa U.S.A., Inc.*, 2004 WL 3030043 (Ariz. Super. Ct. Dec. 8, 2004).  Plaintiffs contend that neither the text of the Arizona statute nor the cases Amazon cites broadly precludes non-purchasers from having antitrust standing.  (Opp'n 18.)

In *Consiglio-Tseffos*, plaintiffs sought to recover damages for inflated product prices for goods sold by merchants who offered credit and debit card services of Mastercard and Visa.  2004 WL 3030043, at *1.  The trial court held that those plaintiffs lacked standing because they were not even indirect purchasers of the services sold by Mastercard and Visa, even if plaintiffs were "certainly indirect victims."  *Id.*  In doing so, the trial court relied on *Bunker's Glass Co. v. Pilkington, PLC*, where the Arizona Supreme Court held that indirect-purchaser plaintiffs had

---

[23] Amazon does not seem to dispute the timeliness of claims arising under the laws of Arkansas, Michigan, New York, North Carolina, Rhode Island, South Dakota, Utah, and West Virginia.  (*See* MTD Br. App A; Opp'n 30 n.11.)

[24] The parties do not dispute that the claims under Arizona law are limited to those between November 8, 2018, and March 2019.  (MTD Br. 38 & n.25; Opp'n 30.)

antitrust standing.  *Id.* (citing *Bunker's Glass Co. v. Pilkington, PLC*, 75 P.3d 99, 107 (Ariz. 2003)).  The trial court in *Consiglio-Tseffos* contrasted the *Bunker's Glass* decision with the interpretation of *AGC* as "preclud[ing] suits by indirect purchasers."  *Id.*

However, *Consiglio-Tseffos* is not dispositive here for least two reasons.  First, the facts are distinguishable.  The FAC alleges that Plaintiffs were directly harmed by the PPR-scheme, even though (and, perhaps, especially because) they purchased the Class Products on non-Amazon platforms.  *Consiglio-Tseffos*, which involved merchants passing on credit-card charges to customers, does not involve the kind of conduct that allegedly ties defendants there to plaintiff's injuries through a scheme that pegs product prices based on the defendants' policies.  Second, *Consiglio-Tseffos* misconstrues *Bunker's Glass*, which did not limit antitrust standing to only direct and indirect purchasers.  *Bunker's Glass* noted that "Arizona's statutory language would plainly include indirect purchasers," 75 P.3d at 107, but did not hold that only direct and indirect purchasers had antitrust standing.  Indeed, the Arizona Supreme Court deferred to the legislature and relied on, among other things, the state statutory text as "broadly grant[ing] a right of action to any 'person' injured in business or property by the anti-competitive acts of another."  *Id.*  To the extent that *Consiglio-Tseffos* interprets *Bunker's Glass* to be a rejection of *AGC*, I disagree.  *Bunker's Glass* did not reject *AGC*.

Amazon's citation to the federal court decision in *Oliver* is not dispositive either.  There, the court noted that plaintiffs "fail[ed] to engage with *Consiglio-Tseffos*, . . . or any other Arizona . . . case law."  *Oliver*, 2021 WL 386749, at *7.  The *Oliver* court accordingly did not analyze other state statutes or case law and summarily granted the defendant's motion for judgment on the pleadings as to plaintiffs' Arizona antitrust law claims.  Plaintiffs here also fail to address *Consiglio-Tseffos*, specifically, or other state court decisions.  Neither *AGC, Consiglio-Tseffos*,

nor any other authority I am aware of, broadly prohibits antitrust standing from non-purchasers.

I therefore cannot find that the Arizona Supreme Court would categorically preclude non-purchasers from having antitrust standing.  Accordingly, Amazon's motion to dismiss the antitrust claims under Arizona law is DENIED.

**b.**  Arkansas[25]

The Arkansas Deceptive Trade Practices Act ("ADTPA") was amended on August 1, 2017 to require that the plaintiff prove he "suffered an actual financial loss proximately caused by his or her reliance on the use of a practice declared unlawful under this chapter."  Ark. Code § 4-88-113(f)(2).  Amazon contends that (1) Plaintiffs lack antitrust standing for failure to show proximate causation regarding products purchased prior to the 2017 amendment, and (2) Plaintiffs further fail to allege the element of reliance regarding products purchased after the 2017 amendment.  (MTD Br. 20.)  As to the latter, Plaintiffs concede that "claims based on the alleged violation of the Arkansas Deceptive Trade Practices should be dismissed to the extent they are based on purchases on or after August 1, 2017."  (Opp'n 29 n.10.)

The remaining issue concerns products purchased prior to the 2017 amendment and whether Plaintiffs have shown proximate causation.  Amazon fails to cite to any state court decision and instead cites to two federal court opinions to support Amazon's claim that proximate causation is required.  (MTD Br. 20 (citing *Ashley Cnty. Ark. v. Pfizer Inc.*, 552 F.3d 659 (8th Cir. 2009); *Indep. Cnty. v. Pfizer, Inc.*, 534 F. Supp. 2d 882 (E.D. Ark. 2008)).)  Plaintiffs argue that they have sufficiently alleged proximate causation, and that Amazon's arguments mistakenly assume Plaintiffs' reliance on the umbrella theory.  (Opp'n 17–18.)   In its reply, Amazon characterizes proximate causation to be "a requirement identical to *AGC*'s first

---

[25] Amazon does not present any timeliness argument regarding Plaintiffs' claims under Arkansas law.

factor." (Reply 11.)

I am not aware of—and no party has identified—any Arkansas state court decision concerning whether or not the ADTPA's requirement of proximate causation is identical to that of the first *AGC* factor. Amazon argues that, prior to a statutory amendment in 2017, courts construed the ADTPA to require proximate causation. (MTD Br. 20.) However, assuming that the requirement is identical to the first *AGC* factor, as Amazon requests, because I have found that Plaintiffs have adequately pled the first *AGC* factor, Amazon's motion to dismiss the antitrust claims under Arkansas law is DENIED.

### c. Connecticut

#### i. *Antitrust Standing*

The parties do not dispute that Connecticut would apply the *AGC* factors. (*See* Opp'n 17 (listing states that Plaintiffs dispute would adopt *AGC*).) Because I find that Plaintiffs have antitrust standing under *AGC*, I therefore find that they have antitrust standing under Connecticut law.

#### ii. *Timeliness*

Amazon argues Plaintiffs' claims should be limited to those between November 2018 and March 2019 due to Connecticut's four-year statute of limitations. (MTD Br. 38 & n.25.) Amazon concedes that Connecticut has adopted *American Pipe* tolling. (*See* Reply 17–18 & n.10 (citing *Grimes v. Hous. Auth. of the City of New Haven*, 698 A.2d 302 (Conn. 1997).) However, Amazon argues that adoption of *American Pipe* tolling does not, by itself, "warrant[] extension of cross-jurisdictional class action tolling to a state that has not adopted it." (Reply 18.)

Plaintiffs invoke cross-jurisdictional tolling by citing to a Connecticut Appellate Court

decision applying Connecticut's savings statute cross-jurisdictionally, as well as a federal case

predicting that "Connecticut would recognize cross-jurisdictional class-action tolling." (Opp'n

36 (citing *Daoust v. McWilliams*, 716 A.2d 922, 927 (Conn. App. Ct. 1998); *In re Libor-Based*

*Fin. Instruments Antitrust Litig.*, No. 11-MDL-2262, 2015 WL 4634541, at *132 (S.D.N.Y. Aug.

4, 2015), *amended by*, 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015)).) Amazon opposes these

arguments in conclusory fashion and without citing to any contrary authority. (*See* Reply 17–

18.)

I agree with the court in *LIBOR* and likewise "predict that Connecticut would recognize

cross-jurisdictional class-action tolling" under *American Pipe*. *See LIBOR*, 2015 WL 4634541,

at *132.

Accordingly, Amazon's motion to dismiss the claims under Connecticut law is DENIED.

### d. Florida

#### i. *Antitrust Standing*

Amazon argues no antitrust standing under Florida law because proximate causation is

required. (MTD Br. 20.) Plaintiffs aver that Amazon's arguments regarding proximate

causation fail because they incorrectly assume that Plaintiffs rely on the umbrella theory. (Opp'n

17–18.) In reply, Amazon argues that Florida has "applied *AGC* and proximate causation to bar

non-purchaser standing." (Reply 9 (citing *Se. Fla. Laborers Dist. Health & Welfare Tr. Fund* v.

*Philip Morris*, No. 97-CV-8715, 1998 WL 186878, at *6 & n.7 (S.D. Fla. Apr. 13, 1998)).)

Assuming, as Amazon concedes, that Florida adopts *AGC*, Plaintiffs have adequately pled

antitrust standing under *AGC*, so they have antitrust standing under Florida law as well.

#### ii. *Timeliness*

Amazon argues Plaintiffs' claims should be limited to those between November 2018 and

March 2019 due to Florida's four-year statute of limitations.  (MTD Br. 38 & n.25.)  Plaintiffs claim that Florida state courts have approved of *American Pipe* tolling, and therefore it is likely that Florida would adopt cross-jurisdictional tolling as well.  (Opp'n 37 (citations omitted).).

I disagree with Plaintiffs—the two cases they cite do not stand for the proposition that Florida recognizes cross-jurisdictional tolling of state law claims due to the previous filing of a federal class action.  First, *Gaff v. R.J. Reynolds Tobacco Co.* is inapplicable because it did not involve cross-jurisdictional tolling; it merely "assume[d]" *American Pipe* tolling based on a previously filed suit in the same jurisdiction of Florida.  129 So. 3d 1142, 1143–45 (Fla. Dist. Ct. App. 2013).  Second, *Hromyak v. Tyco International Ltd.* is also inapplicable because its holding did not opine on whether it would adopt cross-jurisdictional tolling.  942 So. 2d 1022, 1023 (Fla. Dist. Ct. App. 2006).  Rather, *Hromyak* affirmed the trial court's ruling that rejected *American Pipe* tolling because the "the new claims are not identical to those asserted in the earlier federal action."  *Id.*  Plaintiffs thus fail to cite a case showing that Florida courts would recognize cross-jurisdictional tolling.

Statutory authority is also silent on this issue.  Statutory authority from Florida provides a list of conditions where the statute of limitations is tolled, and the filing of a prior class action is not one of them.  Fla. Stat. § 95.051.  Nor is the filing of a prior class action an example of an exception.  *Id.* § 95.051(2) ("A disability or other reason does not toll the running of any statute of limitations except those specified in this section, s. 95.091 [regarding actions to collect taxes], the Florida Probate Code, or the Florida Guardianship Law.").  "Under the canon of construction *expressio unius est exclusio alterius*," a Florida court concluded that "the Legislature purposefully excluded items not included in a list [contained in a statute]."  *See Schoeff v. R.J. Reynolds Tobacco Co.*, 232 So. 3d 294, 304 (Fla. 2017) (citation omitted).  Further, "[s]everal

federal courts that have analyzed the issue have similarly concluded that Florida does not

recognize *American Pipe* tolling." *Anderson v. Mosaic Fertilizer LLC*, No. 19-CV-1225, 2021

WL 4762421, at *7 (M.D. Fla. Sept. 7, 2021) (collecting cases).  Accordingly, I do not find that

the Supreme Court of Florida would recognize cross-jurisdictional tolling under *American Pipe*,

and thus Plaintiffs' claims are limited to purchases between November 8, 2018 and March 2019.

Accordingly, Amazon's motion to dismiss the claims under Florida law is GRANTED IN

PART and DENIED IN PART.

### e. Hawaii

#### i. *Antitrust Standing*

The parties do not dispute that Hawaii would apply the *AGC* factors.  (*See* Opp'n 17

(listing states that Plaintiffs dispute would adopt *AGC*).)  Because I find that Plaintiffs have

antitrust standing under *AGC*, I therefore find that they have antitrust standing under Hawaii law

#### ii. *Timeliness*

Amazon argues Plaintiffs' claims should be limited to those between November 2018 and

March 2019 due to Hawaii's four-year statute of limitations.  (MTD Br. 38 & n.25.)  Plaintiffs

claim that the statute of limitations was tolled under *American Pipe*.  (FAC ¶ 122.)  The Hawaii

Supreme Court has adopted both *American Pipe* tolling and cross-jurisdictional tolling.  *Levi v.

Univ. of Haw.*, 67 Haw. 90, 93 (Haw. 1984) ('We therefore adopt the rule enunciated in

*American Pipe* . . . ."); *Patrickson v. Dole Food Co., Inc.*, 137 Haw. 217, 228 (Haw. 2015) ("We

find the reasoning of those states adopting cross-jurisdictional tolling to be more persuasive, as

well as consistent with our existing precedent . . . ."), *as corrected* (Nov. 18, 2015).  *Coles v. City

and County of Honolulu* did not hold that cross-jurisdictional tolling was exclusively limited to

subsequent individual actions, and instead broadly noted that tolling applied in that case because

47

the class action provided the defendant notice of the subject matter and approximate size of the prospective litigation.  151 Haw. 467, 471 (Haw. 2022).  Accordingly, Plaintiffs' claims under Hawaii law are subject to both *American Pipe* tolling and cross-jurisdictional tolling.

Plaintiffs also invoke the continuing-violation doctrine under Hawaii law.  (*See* Opp'n 30 n.12).  Amazon's arguments regarding the continuing-violation doctrine are generic and non-specific to Hawaii; they involve citations to two federal cases, with no reference to any Hawaii authorities, whether legislative or judicial.  (MTD Br. 35–36.)  Amazon's reply brief also fails to address Plaintiffs' arguments regarding the continuing-violation doctrine under Hawaii law. Accordingly, Amazon's arguments regarding this doctrine are deemed abandoned.  *See Kocourek v. Shrader*, 391 F. Supp. 3d 308, 321 n.101 (S.D.N.Y. 2019) ("[Party] has failed to respond in his reply, and therefore, this argument is abandoned").

Accordingly, Amazon's motion to dismiss the claims under Hawaii law is DENIED.

### iii. *Rule of Reason*

Plaintiffs assert that Hawaii statutes explicitly preclude vertical price-fixing agreements such that they are per se violations.  (Opp'n 19–20 (citing Haw. Rev. Stat. §§ 480-1, 480-4).) Amazon replies that Hawaii has a harmonization statute such that the Hawaii antitrust statutes "shall be construed in accordance with judicial interpretations of similar federal antitrust statutes."  (Reply 13–14 (citing Haw. Rev. Stat. § 480-3).)  Moreover, a federal court in Hawaii found that vertical agreements are subject to the rule of reason.  (*Id.* at 14 (citing *Lucas v. Citizen Commc'ns Co.*, 409 F. Supp. 2d 1206, 1223 (D. Haw. 2005)).)

I agree with Amazon that the antitrust claims under Hawaii law are subject to the rule of reason.  Although the statute uses expansive language in prohibiting agreements to "[f]ix, control, or maintain the price of any commodity," Haw. Rev. Stat. § 480-4, the same statute

48

provides that it "shall be construed in accordance with judicial interpretations of similar federal antitrust statutes, except that lawsuits by indirect purchasers may be brought as provided in this chapter," *id.* § 480-3.  The Hawaii Supreme Court has explained that Hawaii's antitrust statute "logically followed the federal paradigm," and that the "broad prohibitions" of the state statute "may, therefore, be traced to the broad proscriptions" of the federal Sherman Act.  *Island Tobacco Co. v. R. J. Reynolds Tobacco Co.*, 63 Haw. 289, 297 (Haw. 1981), *overruled on other grounds by Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co.*, 91 Haw. 224 (Haw. 1999).  Based on case law and Hawaii's mandatory harmonization statute, which would compel compliance to the Supreme Court decision in *Leegin*, and because of the general presumption for the rule of reason, I hold that Plaintiffs' claims under Hawaii's antitrust statute can proceed under the rule of reason standard.

### f.  Illinois

#### i.  *Antitrust Claims*

Antitrust Standing:  The parties do not dispute that Illinois would apply the *AGC* factors regarding antitrust claims.  (*See* Opp'n 17 (listing states that Plaintiffs dispute would adopt *AGC*).)  Because I find that Plaintiffs have antitrust standing under *AGC*, I therefore find that they have antitrust standing under Illinois' antitrust law.

Timeliness:  Amazon next argues Plaintiffs' antitrust claims should be limited to those between November 2018 and March 2019 due to Illinois' antitrust law's four-year statute of limitations.  (MTD Br. 38 & n.25.)  Plaintiffs contend that the Illinois savings statute—which allows an action to be brought within one year of a prior action being voluntarily dismissed by plaintiffs—renders their claims timely because the *Frame-Wilson* plaintiffs voluntarily dismissed their Illinois state law claims in April 2022 and Plaintiffs initiated this action less than a year

later.  (Opp'n 31.)  Amazon contends that the savings statute is not applicable for Plaintiffs'

Illinois antitrust claims because *Frame-Wilson* did not involve antitrust claims under Illinois law.

(Reply 19 n.12.)

     However, two lawsuits need not have identical claims to benefit from the Illinois savings

statute.  In *First Midwest Bank v. Cobo*, the Illinois Supreme Court relied on principles of res

judicata in determining whether two complaints state the same claim under the Illinois savings

statute.  124 N.E.3d 926, 930 (Ill. 2018).  Illinois courts accordingly utilize the "transactional

test," which "treats separate claims as the same cause of action 'if they arise from a single group

of operative facts.'"  *Id.* (quoting *River Park, Inc. v. City of Highland Park*, 703 N.E.2d 883, 893

(Ill. 1998)).  This means that two claims are "identical if they arise from a single group of

operative facts, regardless of whether they assert different theories of relief."  *Id.* at 931 (internal

quotation marks and emphasis omitted).  Here, the claims in *Frame-Wilson* and those here under

Illinois antitrust law arise from the same set of operative facts, namely Amazon's PPR-scheme

affecting product prices.  Plaintiffs' antitrust claims under Illinois law therefore benefit from the

Illinois savings statute.

     The next inquiry relates to cross-jurisdictional tolling.  The Illinois Supreme Court has

expressly rejected cross-jurisdictional tolling.  *Portwood v. Ford Motor Co.*, 701 N.E.2d 1102,

1105 (Ill. 1998) ("By rejecting cross-jurisdictional tolling, we ensure that the protective filings

predicted by plaintiffs will be dispersed throughout the country rather than concentrated in

Illinois.").  Accordingly, even though Plaintiffs' antitrust claims under Illinois law are not tolled

by *Frame-Wilson*, they are tolled by the Illinois savings statute.

     Amazon's motion to dismiss the antitrust claims under Illinois law is GRANTED IN

PART and DENIED IN PART.

Rule of Reason:  Plaintiffs assert that Section 3(1) of the Illinois Antitrust Act explicitly precludes vertical price-fixing agreements, and that they are therefore per se violations.  (Am. Compl. ¶¶ 169–181; Opp'n 20 (citing, *inter alia*, 740 Ill. Comp. Stat. 10/3, 10/4 (1965 & rev. 1982)).)  Amazon replies with citations to two federal court opinions that have held that vertical agreements are not subject to the per se standard under the relevant Illinois statute.  (Reply 13.) These two federal courts have relied on the Bar Committee Comments-1967 regarding Section 3(1), the cited statute, which state that, "Section 3(1) is expressly limited to agreements between two classes of persons:  (a) those who are competitors and (b) those persons who, but for a prior agreement, would be competitors," and that "Section 3(1) does not reach vertical agreements." *See Force Partners, LLC v. KSA Lighting & Controls, Inc.*, No. 19-CV-07776, 2022 WL 580808, at *19 (N.D. Ill. Feb. 25, 2022) (internal quotation marks and emphasis omitted) (citing Bar Committee Comments); *Sportmart, Inc. v. No Fear, Inc.*, No. 94-C-4890, 1996 WL 296643, at *17 (N.D. Ill. June 3, 1996) (same).  I agree with Amazon and find that the Plaintiffs' claims under Section 3(1) of the Illinois Antitrust Act are subject to the rule of reason.  *Regal Motors, Inc. v. Fiat Motors of N. Am., Inc.*, 479 N.E.2d 1, 3 (Ill. App. Ct. 1985) ("[W]e agree with the proposition that vertical pricing restraints do not fall within the per se violations enumerated in section 3(1) of our Act . . . .").  Accordingly, I hold that Plaintiffs' claims under Illinois' antitrust statute can proceed under the rule of reason standard.

### ii.  *Consumer Protection Claims*

Amazon argues Plaintiffs fail to plead proximate causation, as required by the Illinois Consumer Fraud and Deceptive Business Practices Act, due to its reliance on the umbrella theory.  (MTD Br. 20–21.)  Despite acknowledging that Illinois has not expressly adopted or applied the *AGC* factors, Amazon suggests that *AGC* and the Illinois statute apply a similar

standard regarding "proximate causation."  (*Id.*)  As discussed above, Plaintiffs have already

disclaimed reliance on—and I have rejected any arguments based on—the umbrella theory.

Further, assuming, in Amazon's favor, that the Illinois statute's proximate-causation requirement

is the same as in *AGC*, Amazon's argument fails because I have already found that Plaintiffs

have adequately alleged proximate causation.

However, Amazon is correct in arguing that the Illinois consumer protection claims are

completely time barred due to a 3-year statute of limitations.  (MTD Br. 32–33 & 32 n.19.)  In

*Frame-Wilson*, the court dismissed the Illinois consumer protection claims for failure to allege a

claim.  591 F. Supp. 3d at 994.  Courts have stated that the Illinois savings statute "has no

application" to a claim that was previously dismissed for failure to state a cause of action.

*Bentley v. Glenn Shipley Enterps., Inc.*, 619 N.E.2d 816, 818 (Ill. App. Ct. 1993).  Indeed, the

text of the Illinois savings statute allows for that one-year savings in certain circumstances, such

as when the prior "action is dismissed by a United States District Court for lack of jurisdiction"

or "for improper venue," 735 Ill. Comp. Stat. 5/13-217, but does not expressly indicate that it

applies for dismissals due to a failure to state a claim.

Accordingly, Amazon's motion to dismiss Plaintiffs' claims under the Illinois Consumer

Fraud and Deceptive Business Practices Act is GRANTED as untimely.

### g. Iowa

#### i. *Antitrust Standing*

The parties do not dispute that Iowa would apply the *AGC* factors.  (*See* Opp'n 17 (listing

states that Plaintiffs dispute would adopt *AGC*).)  Because I find that Plaintiffs have antitrust

standing under *AGC*, I therefore find that they have antitrust standing under Iowa law.

####           ii.   *Timeliness*

Amazon argues Plaintiffs' claims should be limited to those between November 2018 and March 2019 due to Iowa's four-year statute of limitations.  (MTD Br. 38 & n.25.)  Plaintiffs argue that Iowa recognizes both *American Pipe* and cross-jurisdictional tolling.  (*Id.* at 38–39.)  As an initial matter, the Iowa Supreme Court cited *American Pipe* approvingly in *Lucas v. Pioneer, Inc.  See* 256 N.W.2d 167, 180 (Iowa 1977) ("The great majority [of federal cases] hold if a class action is maintainable as such, it would be incongruous to say that absent members who are represented by those present may not rely upon the commencement of the action by their fellow class members to toll the running of the statute." (collecting cases)).  Amazon argues that *Lucas* "involved intervention in an already existing class action," (Reply 20 n.14), but fails to show how the Court in *Lucas* cabined its approving citation of *American Pipe* to the specific facts of that case.  I find the logic in *Lucas* sufficient to predict that Iowa would recognize *American Pipe* tolling.

Plaintiffs next invoke cross-jurisdictional tolling by citing to two court decisions applied Iowa's savings statute cross-jurisdictionally.  (Opp'n 37.)  The Supreme Court of Iowa has indeed recognized cross-jurisdictional application of the state savings statute when the prior suit was filed in federal court, even in federal court in another state.  *See, e.g.*, *Grimm v. US W. Commc'ns, Inc.*, 644 N.W.2d 8, 17 (Iowa 2002); *Beilke v. Droz*, 316 N.W.2d 912 (Iowa 1982)[26]. I agree with the court in *LIBOR* and "predict that Iowa would recognize cross-jurisdictional class-action tolling" under *American Pipe.  See LIBOR*, 2015 WL 4634541, at *133.

Accordingly, Amazon's motion to dismiss the claims under Iowa law is DENIED.

---

[26] Plaintiffs state that *Beilke* involved the prior suit being filed in a "foreign state court."  (Opp'n 37.)  This is incorrect because the prior lawsuits were also in federal court.  The plaintiffs in *Beilke* had first filed lawsuits "in a federal district court in Wisconsin," which were then consolidated and then "transferred to the federal district court for the Southern District of Iowa."  *Beilke v. Droz*, 316 N.W.2d 912, 913 (Iowa 1982).

### h. Kansas

#### i. *Antitrust Standing*

The parties do not dispute that Kansas would apply the *AGC* factors.  (*See* Opp'n 17

(listing states that Plaintiffs dispute would adopt *AGC*).)  Because I find that Plaintiffs have

antitrust standing under *AGC*, I therefore find that they have antitrust standing under Kansas law.

#### ii. *Unilateral Conduct*

Amazon contends that the First Amended Complaint only alleges unilateral conduct,

which is not actionable under the Kansas Restraint of Trade Act ("KRTA"), Kan. Stat. §§ 50-

101, *et seq.*  (MTD Br. 27.)  Amazon cites *Smith* v. *Philip Morris Cos*., 335 P.3d 644, 662–67

(Kan. Ct. App. 2014), (*id.*), which in turn quotes *O'Brien v. Leegin Creative Leather Prods.,*

*Inc.*, 277 P.3d 1062 (Kan. 2012).  In *O'Brien*, the Supreme Court of Kansas stated that the

Kansas antitrust statutes "demand something more than merely a unilateral pricing policy."  277

P.3d at 1087.  However, neither the facts nor the holding in *O'Brien* is dispositive here.

In *O'Brien*, Brighton—a fashion accessories company—required its retailers to agree to a

certain pricing policy.  *Id.* at 1068–69.  Consumers of Brighton products alleged violations of the

KRTA.  *Id.* at 1067.  At the summary-judgment stage, the trial court, among other things, denied

Brighton's partial motion for summary judgment "on the issue of whether Brighton acted

unilaterally or in unlawful conjunction with its Kansas retailers."  *Id.* at 1087.  On appeal, the

Kansas Supreme Court, in relevant part, upheld the district court's denial of Brighton's partial

motion for summary judgment.  *Id.* at 1088.  In doing so, the Court stated that this was "not a

case in which the plaintiff can show only a unilateral pricing policy or action," and that "[a]

genuine issue of material fact remains for trial."  *Id*.  Factual issues—such as those involving the

history of enforcement of the policy and other written agreements related to incentive-programs

for retailers to expand their business with Brighton—precluded summary judgment.  *See id.*
Similarly, I cannot say that, as a matter of law, the PPR only alleges unilateral conduct that
dooms Plaintiffs' claim under the KRTA.  Plaintiffs have plausibly alleged concerted activity.

Notably, because the language in the KRTA is similar to the language in the Sherman
Act, the Kansas Supreme Court "look[ed] to interpreting United States Supreme Court precedent
for assistance in understanding what, short of an express agreement, qualifies as more than
merely unilateral behavior."  *Id.* at 1087.  Accordingly, federal cases that interpret the Sherman
Act regarding this issue may be instructive.  For example, in *De Coster*, the Court denied
Amazon's motion to dismiss and held that "Amazon has failed to demonstrate a lack of
concerted action, or that concerted action is implausible."  *De Coster*, 2023 WL 372377, at *4.
Specifically, the court construed the operative complaint "in the light most favorable to
Plaintiffs" and stated that "the third-party merchants are active participants who set their prices
and otherwise engage with Amazon's policies in an active, albeit allegedly unwilling, way."  *Id.*
In *United States v. Delta Dental of Rhode Island*, the plaintiff's allegations of dentists' explicit
agreement to comply with certain contracts containing a most-favored-nation clause sufficiently
constituted "concerted action" under Section 1 of the Sherman Act.  943 F. Supp. 172, 175–76
(D.R.I. 1996).  These cases suggest that the TPS' agreement to the PPR, which was heavily
enforced by Amazon, plausibly constituted "concerted action" under the Sherman Act.  I
accordingly hold that the Kansas Supreme Court would interpret the KRTA to find similarly and
hold that Plaintiffs' allegations are thus actionable under the KRTA.

### iii.  *Timeliness*

Amazon argues that the KRTA claims are completely time barred due to a 3-year statute
of limitations.  (MTD Br. 32–33 & 32 n.20.)  As an initial matter, "Kansas does not recognize

class-action tolling, or any tolling during the pendency of an action." *LIBOR*, 2015 WL
4634541, at *133 (citing *Waltrip v. Sidwell Corp.,* 678 P.2d 128, 133 (Kan. 1984)).  Amazon
also argues that Plaintiffs did not invoke the Kansas savings statute, let alone if or how it would
apply.  Kan. Stat. § 60-518.  Because I do not find that any of Plaintiffs' claims are tolled, I
accordingly find that Plaintiffs' claims under Kansas law are time barred.

Accordingly, Amazon's motion to dismiss the claims under Kansas law is GRANTED as
untimely.

### i.  Maine

#### i.  *Antitrust Standing*

Amazon argues that there is no antitrust standing under Maine law because it adopted
*AGC*.  (MTD Br. 14–15.)  Assuming, in Amazon's favor, that Maine adopts *AGC*, Plaintiffs have
adequately pled antitrust standing under *AGC*, so they have antitrust standing under Maine law
as well.

#### ii.  *Timeliness*

Amazon argues Plaintiffs' claims should be limited to those between November 2016 and
March 2019 due to Maine's six-year statute of limitations.  (MTD Br. 40 & n.27.)  Plaintiffs
contend that the Maine state courts would adopt both *American Pipe* tolling and cross-
jurisdictional tolling because Maine's jurisprudence regarding class actions aligns itself with
federal law.  (Opp'n 38–39.)  The Supreme Judicial Court of Maine, the highest state court, has
stated that it "look[s] to both state and federal antitrust law for guidance in the interpretation of
the Maine antitrust statute, including the accrual of an antitrust claim."  *McKinnon v. Honeywell
Int'l, Inc.*, 977 A.2d 420, 424 (Me. 2009); *cf. Millett v. Atl. Richfield Co.*, 760 A.2d 250, 253–54
(Me. 2000) ("Because the federal class action rule, F.R. Civ. P. 23, was identical in all respects

to Maine's current class action rule, [federal law] is persuasive authority.").  Given this

jurisprudence—and the fact that Amazon does not dispute otherwise—I assume that Maine has

adopted *American Pipe* tolling.

Amazon argues that any adoption of *American Pipe* tolling does not, by itself, "warrant[]

extension of cross-jurisdictional class action tolling to a state that has not adopted it."  (Reply

18.)  However, as I have explained above, if a state has adopted *American Pipe* tolling—which I

assume here—I presume that they would adopt cross-jurisdictional tolling absent state-specific

considerations.  *LIBOR*, 2015 WL 4634541, at *129.  Because I find no Maine-specific

considerations to the contrary—and Amazon has not identified any—I predict that Maine would

recognize cross-jurisdictional tolling under *American Pipe*.

Accordingly, Amazon's motion to dismiss the claims under Maine law is DENIED.

### j.  Maryland

#### i.  *Antitrust Standing*

The parties do not dispute that Maryland would apply the *AGC* factors.  (*See* Opp'n 17

(listing states that Plaintiffs dispute would adopt *AGC*).)  Because I find that Plaintiffs have

antitrust standing under *AGC*, I therefore find that they have antitrust standing under Maryland

law.

#### ii.  *Timeliness*

Amazon argues Plaintiffs' claims should be limited to those between November 2018 and

March 2019 due to Maryland's four-year statute of limitations.  (MTD Br. 38 & n.25.)  In *Adedje*

*v. Westat, Inc.*, the Court of Special Appeals of Maryland[27] joined the purported "majority" of

---

[27] After a constitutional amendment was ratified on November 8, 2022, the Court of Special Appeals was renamed as the Appellate Court of Maryland.  *Washington v. Maryland*, 287 A.3d 301, 309 n.2 (Md. 2022).

jurisdictions and declined to recognize cross-jurisdictional tolling.  75 A.3d 401, 418 (Md. Ct.

Spec. App. 2013).  However, the same court—now called the Appellate Court of Maryland—

seemingly reversed course in *Cain v. Midland Funding, LLC*, by recognizing cross-jurisdictional

tolling and limiting the holding in *Adedja* to the "procedural history and the facts of that case."

256 A.3d 765, 801 n. 29 (Md. App. Ct. 2021).  Amazon argues that cross-jurisdictional tolling in

*Cain* was limited to "later filed individual claims," (Reply 20 n.15), but fails to offer proof of this

assertion.  Indeed, *Cain* "conclude[d] that the same principles that support intra-jurisdictional

class tolling also support cross-jurisdictional class action tolling."  256 A.3d at 802.  Because

Amazon fails to demonstrate that *Cain*'s holding applied exclusively to individual claims—and

not to subsequent class actions—I predict that the highest court of Maryland, the Supreme Court

of Maryland, would recognize *American Pipe* and cross-jurisdictional tolling.

   Accordingly, Amazon's motion to dismiss the claims under Maryland law is DENIED.

### iii. *Rule of Reason*

   Plaintiffs assert that Maryland statutes explicitly preclude vertical price-fixing

agreements.  (Opp'n 19–20 (citing, *inter alia*, MD. Code Com. Law §§ 11-201, 11-204 (2009)).)

Plaintiffs also contend that the *Frame-Wilson* court—relying on *The Yellow Cab Co. v. Uber

Techs., Inc.*, No. 14-CV-2764, 2015 WL 4987653 (D. Md. Aug. 19, 2015)—found the PPR to be

per se illegal under the Maryland antitrust statute.  (Opp'n 22 (citations omitted).)  Amazon

replies that *Yellow Cab* is distinguishable because it involved an agreement where Uber (as the

supplier) set the prices that were charged by independent drivers, whereas here, Amazon does

not set any prices that any TPS charged.  (Reply 15.)

   Maryland's antitrust statute prohibits as an "unreasonable restraint of trade or

commerce," any "contract, combination, or conspiracy that establishes a minimum price below

which a retailer, wholesaler, or distributor may not sell a commodity or service." Md. Code

Com. Law § 11-204(b). In other words, the statutory text essentially defines an "unreasonable

restraint of trade" explicitly to include minimum price-fixing arrangements. *See id.* This is in

contrast to the Sherman Antitrust Act, which does not contain a similar statutory definition. *See*

*Leegin*, 551 U.S. at 882 (holding that vertical minimum price-fixing is analyzed under the rule of

reason). Indeed, the highest court in Maryland applied the per se rule on vertical price-fixing

agreements in a motion for summary judgment. *Nat. Design, Inc. v. Rouse Co.*, 485 A.2d 663,

669 (Md. 1984) ("Thus, the per se rule as applied to vertical price-fixing agreements still retains

its vitality. The per se rule is applicable to the case at bar to the extent that the facts show a price-

fixing arrangement."). *Yellow Cab* is not sufficiently distinguishable because it involved

allegations that the defendant Uber, "with the participation of its drivers . . . conspired to set a

minimum price threshold below which the drivers may not charge." 2015 WL 4987653, at *5.

Even though Amazon may not have set the individual product prices, it entered into a contract

with TPSs that ensured whatever product price TPSs set would be the minimum price on the

Amazon Platform. Accordingly, I hold that Plaintiffs' antitrust claims under Maryland law can

proceed under the per se standard.

### k. Michigan[28]

The parties do not dispute that Michigan would apply the *AGC* factors. (*See* Opp'n 17

(listing states that Plaintiffs dispute would adopt *AGC*).) Because I find that Plaintiffs have

antitrust standing under *AGC*, I therefore find that they have antitrust standing under Michigan

law. Accordingly, Amazon's motion to dismiss the claims under Michigan law is DENIED.

---

[28] Amazon does not present any timeliness argument regarding Plaintiffs' claims under Michigan law.

**l.** <u>Minnesota</u>

**i.** *Antitrust Standing*

Amazon argues no antitrust standing under Minnesota law because proximate causation is required under Minnesota's antitrust statute.  (MTD Br. 20–21.)  Amazon seems to conflate Minnesota's proximate-causation requirement with the *AGC* factors.  (*Id.* at 20 ("Proximate causation is, as explained above, the first of the efficient enforcer factors set forth in *AGC*.").)  Amazon is mistaken.

The Supreme Court of Minnesota rejected the *AGC* factors as the "benchmark for antitrust standing in Minnesota."  *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 627 (Minn. 2007).  Although Amazon cites to cases that have applied *AGC* to state antitrust claims despite that state having adopted an *Illinois Brick* repealer statute, (MTD Br. 8), the Minnesota Supreme Court did not find them to be "analytically distinct" inquiries, *Lorix*, 736 N.W.3d at 629, and instead affirmed the district court's recognition that the *AGC*-factor of directness of injury "cannot apply in Minnesota because indirect purchasers are explicitly vested with a cause of action under" Minnesota's *Illinoi-Brick* repealer statute, *id.* at 627 (citing Minn. Stat. § 325D.57).  In sum, *Lorix* rejected the two arguments Amazon relied on in its motion to dismiss:  (1) that the Minnesota antitrust statute's proximate causation is the same as the first *AGC* factor and (2) that the directness-of-injury inquiry under *AGC* is "analytically distinct" from the one in *Illinois Brick*.  Therefore, Amazon fails to argue that Plaintiffs lack antitrust standing under Minnesota's proximate-causation requirement.[29]

---

[29] Although neither party has cited it, *Gutzwiller v. Visa U.S.A., Inc.*, No. C4-04-58, 2004 WL 2114991 (Minn. Dist. Ct. Sept. 15, 2004)) is distinguishable from this action.  In that case, plaintiffs alleged overcharges "passed on to consumers in the form of higher prices on essentially every good sold in the state of Minnesota, even those purchased with cash."  *Lorix*, 736 N.W.2d at 632 (citing *Gutzwiller*, 2004 WL 2114991, at *2).  The court in *Lorix* analyzed *Gutzwiller*, and held that these injuries were "most likely too remote and speculative to afford standing."

### ii. *Timeliness*

Amazon argues Plaintiffs' claims should be limited to those between November 2018 and March 2019 due to Minnesota's four-year statute of limitations.  (MTD Br. 38 & n.25.)  Amazon concedes that the Minnesota Court of Appeals has adopted *American Pipe* tolling.  (*See* Reply 17–18 & n.10 (citing *Bartlett v. Miller & Schroeder Municipals, Inc.*, 355 N.W.2d 435, 439 (Minn. Ct. App. 1984)).)  However, Amazon argues that adoption of *American Pipe* tolling does not, by itself, "warrant[] extension of cross-jurisdictional class action tolling to a state that has not adopted it."  (Reply 18.)

As I noted, whether a state court adopts *American Pipe* tolling—which is arguable here— is distinct from the issue of whether it would adopt cross-jurisdictional tolling.  However, because I do not find any authority that indicates that Minnesota would not adopt cross-jurisdictional tolling, I predict that Minnesota would recognize cross-jurisdictional tolling under *American Pipe*.

Accordingly, Amazon's motion to dismiss the antitrust claims under Minnesota law is DENIED.

### iii. *Rule of Reason*

Plaintiffs cite to *State by Humphrey v. Alpine Air Prod., Inc.*, where the Minnesota Court of Appeals held that "vertical price-fixing must be considered a per se violation of Minnesota antitrust law."  490 N.W.2d 888, 894 (Minn. Ct. App. 1992), *aff'd*, 500 N.W.2d 788 (Minn.

---

*Lorix*, 736 N.W.2d at 632.

However, this action does not involve "every good sold in the state of Minnesota," *id.*, and is narrower in scope; the Class Products must have both (1) "been sold through a retail e-commerce channel other than" Amazon or the TPS' own website and (2) "been concurrently offered by" a TPS "at substantially the same price as the product was offered on the retail e-commerce channel above in (1)."  (Am. Compl. ¶ 97.)  Further, *Gutzwiller* did not involve the kind of most-favored nation agreement like the PPR here, which provides the connective tissue between Amazon, TPSs, and consumers, which provide the proximate causation required under Minnesota law.

1993).  Amazon replies that *Alpine Air* relied on "then-existing federal precedent" (which has since been abrogated by *Leegin*) and not on "the text of the state antitrust statute, which the court held includes language 'indicat[ing] vertical price-fixing agreements are excluded' from the list of per se prohibitions."  (Reply 14 (alteration in original) (citation omitted).)  Thus, the parties seem to suggest that *Alpine Air* is the seminal case with regard to this issue.

In *Alpine Air*, the Minnesota Court of Appeals upheld the trial court's determination that defendant's conduct constituted "per se violations of Minnesota antitrust law, Minn. Stat. §§ 325D.49–66."  490 N.W.2d at 893.  There, the Court noted that the Minnesota antitrust statute "codified much of the pre-1971 federal case law and follows the provisions of the Sherman Act to a significant degree."  *Id.* (internal citation omitted).  The Court of Appeals then analyzed Section 325D.53, which enumerates per se violations, and noted that "[i]nclusion of the language 'between two or more persons in competition'" in Section 325D.53 suggested "vertical price-fixing agreements are excluded from the reach of this subsection."  *Id.* at 893–94.  Despite this language, the Court stated that Section 325D.53 is not an exhaustive list of per se violations, *id.* at 894 ("[A]ctions not included in section 325D.53 may still receive per se treatment under Minn. Stat. § 325D.51."), and held that "vertical price-fixing must be considered a per se violation of Minnesota antitrust law," *id.*

I hold that Plaintiffs' allegations of vertical price-fixing must be evaluated under the per se standard because *Alpine Air*, which was affirmed by the Minnesota Supreme Court, remains binding.  Amazon emphasizes that the federal precedent *Alpine Air* relied on was abrogated by *Leegin*, 551 U.S. 877, and therefore the Minnesota state antitrust statute must be interpreted in light of *Leegin*.  (Reply 14.)  I disagree.  The *Alpine Air* court described the "advantages [on] relying on federal precedent" in interpreting the Minnesota antitrust law, but concluded that

"Minnesota antitrust law should be interpreted consistently with federal court interpretations of the Sherman Act unless state law is clearly in conflict with federal law."  490 N.W.2d at 894. Here, *Leegin*—which held that vertical minimum price-fixing should be evaluated under the rule of reason, 551 U.S. at 882—now clearly conflicts with *Alpine Air*, as affirmed by the Minnesota Supreme Court, 500 N.W.2d 788.  Since *Leegin* was decided, the Minnesota Supreme Court has discussed *Alpine Air*, albeit never in the context of antitrust claims.  *See, e.g.*, *Minnesota v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124, 133–34 (Minn. 2019) (citing *Alpine Air* in the context of consumer-fraud statute); *C.O. v. Doe*, 757 N.W.2d 343, 353 (Minn. 2008) (citing *Alpine Air* in describing the standard of proof for a statutorily created cause of action when the statute does not provide one).  Unless and until the Minnesota Supreme Court says otherwise, *Alpine Air* remains the law of Minnesota, and vertical price-fixing agreements are per se violations of the Minnesota antitrust law.

*Alpine Air* separately noted the policy justifications for applying a per se standard to vertical price-fixing because it "is almost always pernicious because an unfair benefit is conferred on the seller or the dealer to the detriment of consumers."  490 N.W.2d at 894.  These policy considerations bolster the *Alpine Air* court's reasoning, independent from its reliance on federal precedent.

Accordingly, I hold that Plaintiffs' claims of vertical price-fixing under Minnesota law can proceed under the per se standard.

### m. Mississippi

Because the parties do not dispute that Plaintiffs' claims under the Mississippi Antitrust Statute are untimely, (MTD Br. 32 & n.19; Opp'n 30), those claims are DISMISSED.  Therefore, I decline to and need not consider whether Plaintiffs had antitrust standing under Mississippi

law.  Amazon's motion to dismiss the claims under Mississippi law is GRANTED.

> **n.** Missouri[30]

Amazon contends that the alleged claims are not actionable under the Missouri

Merchandising Practices Act ("MMPA"), Mo. Stat. §§ 407.010, *et seq.*  (MTD Br. 31.)  Amazon

argues that Plaintiffs' allegations—which sound more in fraud than antitrust—are not "in

connection with the sale or advertisement" of merchandise.  (*Id.* (internal quotation marks and

emphasis omitted).)  The parties dispute whether the statutory text regarding "unfair practice[s],"

covers Plaintiffs' claims when they are not "in connection with the sale or advertisement of any

merchandise."  (*Compare* Opp'n 28–29, *with* Reply 16–17.)  In other words, Plaintiffs do not

seem to argue that their allegations actually involve those "in connection with the sale or

advertisement of any merchandise."  Mo. Stat. § 407.020.  Rather, their argument is that their

allegations of unfair practices do not need to be "in connection with the sale or advertisement of

any merchandise" to be a violation of the MMPA.  (Opp'n 28–29 ("The 'in connection with the

sale or advertisement' language applies to misrepresentations directed at consumers, but the

prohibition on engaging in 'unfair practice[s]' stands on its own.").)  I disagree.

The MMPA prohibits "[t]he act, use or employment by any person of any deception,

fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment,

suppression, or omission of any material fact in connection with the sale or advertisement of any

merchandise."  Mo. Stat. § 407.020.  The Supreme Court of Missouri, sitting en banc, stated that

Section 407.020 "makes the 'act, use or employment by any person' of any unfair or deceptive

practice done 'in connection with the sale or advertisement of any merchandise' unlawful."

---

[30] The parties do not dispute that the claims under Missouri law are limited to those between November 8, 2017, and March 2019.  (MTD Br. 39; Opp'n 30.)  Also, Amazon does not dispute antitrust standing under Missouri law. (MTD Br. 23 n.11.)

*Watson v. Wells Fargo Home Mortg., Inc.*, 438 S.W.3d 404, 407 (Mo. 2014) (en banc) (emphasis

omitted).  This indicates that the Missouri Supreme Court interpreted Section 407.20 such that

any alleged "unfair practice" must be "in connection with the sale or advertisement of any

merchandise."  *See also Missouri v. Kowalski*, 587 S.W.3d 709, 716 (Mo. Ct. App. 2019) ("[A]ll

MMPA cases must allege a relationship between the sale of merchandise and the allegedly

unlawful conduct." (citation omitted)).  Because Plaintiffs do not claim that their allegations

involve those "in connection with the sale or advertisement of any merchandise," Mo. Stat.

§ 407.020, their claims under the MMPA are DISMISSED.[31]

Accordingly, Amazon's motion to dismiss the claims under Missouri law is GRANTED.

### o. Nebraska

#### i. *Antitrust Standing*

The parties do not dispute that Nebraska would apply the *AGC* factors.  (*See* Opp'n 17

(listing states that Plaintiffs dispute would adopt *AGC*).)  Because I find that Plaintiffs have

antitrust standing under *AGC*, I therefore find that they have antitrust standing under Nebraska

law.

#### ii. *Timeliness*

Amazon argues Plaintiffs' claims should be limited to those between November 2018 and

March 2019 due to Nebraska's four-year statute of limitations.  (MTD Br. 38 & n.25.)  Plaintiffs

argue that the Nebraska state courts would adopt both *American Pipe* tolling and cross-

jurisdictional tolling because Nebraska's jurisprudence regarding class actions aligns itself with

federal law.  (Opp'n 38–39 (citing *Gant v. City of Lincoln*, 225 N.W.2d 549, 551 (Neb. 1975)).)

---

[31] Because Plaintiffs' claims under Missouri law are dismissed, I do not consider whether they would be evaluated under the per se standard or the rule of reason.

In *Gant*, the Court stated that Section 25-319 of the Nebraska Revised Statutes—which is the section governing class actions—"is in line with generally accepted practices." *Gant*, 225 N.W.2d at 551 (citing 59 Am. Jur. 2d Parties § 54). Despite the imprecise language in *Gant*, other courts have opined that the policy rationale underlying Section 25-319 appears to be similar to those underlying Rule 23 of the Federal Rules of Civil Procedure. *See Most v. Westinghouse Elec. Co., LLC*, No. CI00-10, 2001 WL 34034523, at *1 (Neb. Dist. Ct. Apr. 12, 2001) (citing *Blankenship v. Omaha Pub. Power Dist.*, 237 N.W.2d 86, 90 (Neb. 1976)). Because Amazon does not contend otherwise, I assume that Nebraska has adopted *American Pipe* tolling.

Amazon argues that any adoption of *American Pipe* tolling does not, by itself, "warrant[] extension of cross-jurisdictional class action tolling to a state that has not adopted it." (Reply 18.) However, as I have explained above, if a state has adopted *American Pipe* tolling—which I assume here—I presume that they would adopt cross-jurisdictional tolling absent state-specific considerations. *LIBOR*, 2015 WL 4634541, at *129. Because I find no Nebraska-specific considerations to the contrary, I predict that Nebraska would recognize cross-jurisdictional tolling under *American Pipe*.

Accordingly, Amazon's motion to dismiss the claims under Nebraska law is DENIED.

        **p.** <u>Nevada</u>

            **i.** *Antitrust Standing*

The parties do not dispute that Nevada would apply the *AGC* factors. (*See* Opp'n 17 (listing states that Plaintiffs dispute would adopt *AGC*).) Because I find that Plaintiffs have antitrust standing under *AGC*, I therefore find that they have antitrust standing under Nevada law.

ii.  *Timeliness*

Amazon argues Plaintiffs' claims should be limited to those between November 2018 and March 2019 due to Nevada's four-year statute of limitations.  (MTD Br. 38 & n.25.)  Plaintiffs cite to a state trial court which applied cross-jurisdictional tolling.  (Opp'n 36 (citing *Haberkorn v. Archon Corp.*, No. A-16-732619-B, 2016 WL 11164442, at *1 (Nev. Dist. Ct. Aug. 04, 2016)).)  Plaintiffs emphasize that the Nevada Supreme Court denied a writ of mandamus on the question of cross-jurisdictional tolling, further affirming that Plaintiffs' claims benefit from cross-jurisdictional *American Pipe* tolling.  (*Id.* (citing *Archon Corp. v. Eighth Judicial Dist. Court of Nev.*, 407 P.3d 702 (Nev. 2017)).)  In reply, Amazon notes that (1) the trial court in *Haberkorn* did not provide any reasoning for its adoption of intra-jurisdictional tolling and (2) that the Nevada Supreme Court denied the mandamus petition on procedural grounds, and therefore should not be interpreted as an adoption of cross-jurisdictional tolling.  (Reply 20 n.15.)

As I have explained above, if a state has adopted *American Pipe* tolling—which I assume here because Amazon does not argue that Nevada courts rejected *American Pipe* tolling[32]—I presume that they would adopt cross-jurisdictional tolling absent state-specific considerations.  *LIBOR*, 2015 WL 4634541, at *129.  Even if Amazon's arguments about *Haberkorn* are correct, Amazon fails to demonstrate state-specific considerations that rebut the presumption of cross-jurisdictional tolling.  I therefore predict that Nevada would recognize cross-jurisdictional tolling under *American Pipe*.

---

[32] Amazon only argues that (1) *American Pipe* tolling does not apply in this action more broadly, and (2) Nevada courts have not adopted cross-jurisdictional tolling.  (MTD Br. 36–39.)  I find that, because Amazon failed to argue that Nevada courts have not adopt *American Pipe tolling*, it abandoned that argument.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended.").

Accordingly, Amazon's motion to dismiss the claims under Nevada law is DENIED.

### iii. *Rule of Reason*

Plaintiffs assert that the Nevada Unfair Trade Practice Act ("UTPA") explicitly precludes vertical price-fixing agreements. (Opp'n 19–20 (citing, *inter alia*, N.R.S. §§ 598A.020, 598A.060 (1975 & amended 1981, 2001)).) Specifically, Section 598A.060 explicitly prohibits "[p]rice fixing, which consists of raising, depressing, fixing, pegging or stabilizing the price of any commodity." Section 598A.020, in turn, defines "[c]ommodity" to mean "any goods, merchandise . . . for use, consumption, enjoyment or resale." Further, Section 598A.050 states that the UTPA "shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes.'" *See also Nev. Recycling & Salvage, Ltd. v. Reno Disposal Co., Inc.*, 423 P.3d 605, 607 (Nev. 2018) (quoting Nev. Rev. Stat. § 598A.050). The parties fail to cite— nor have I found—a single state court case regarding the per se standard or the rule of reason in an antitrust claim arising under the UTPA, so it is unclear how the Nevada courts would rule. However, because of Nevada's mandatory harmonization statute, which would compel compliance to the Supreme Court decision in *Leegin*, and because of the general presumption for the rule of reason, I hold that Plaintiffs' antitrust claims under the UTPA can proceed under the rule of reason standard.

### q. New Hampshire

### i. *Antitrust Claims*

### a. *Antitrust Standing*

Amazon argues no antitrust standing under New Hampshire's antitrust statute because it looks to federal antitrust law for guidance. (MTD Br. 22–23.) Assuming, in Amazon's favor, that New Hampshire adopts *AGC*, Plaintiffs have adequately pled antitrust standing under *AGC*

so they have antitrust standing under New Hampshire law as well.

### b.  Timeliness

Amazon contends Plaintiffs' antitrust claims should be limited to those between November 2018 and March 2019 due to New Hampshire's four-year statute of limitations. (MTD Br. 38 & n.25.)  Plaintiffs assert that the New Hampshire state courts would adopt both *American Pipe* tolling and cross-jurisdictional tolling because New Hampshire's jurisprudence regarding class actions aligns itself with federal law.   (Opp'n 38–39.)

The New Hampshire Supreme Court has stated that "Superior Court Rule 27–A, which provides the criteria for class certification, is similar to its federal counterpart, Federal Rule of Civil Procedure 23," and therefore they "rely upon federal cases interpreting the federal rule as analytic aids."  *In re Bayview Crematory, LLC*, 930 A.2d 1190, 1193 (N.H. 2007) (citation omitted).  Given this jurisprudence—and the fact that Amazon does not dispute otherwise—I assume that New Hampshire has adopted *American Pipe* tolling.

Rather, Amazon argues that any adoption of *American Pipe* tolling does not, by itself, "warrant[] extension of cross-jurisdictional class action tolling to a state that has not adopted it." (Reply 18.)  However, as I have explained above, if a state has adopted *American Pipe* tolling— which I assume here—I presume that they would adopt cross-jurisdictional tolling absent state-specific considerations.  *LIBOR*, 2015 WL 4634541, at *129.  Because I find no New Hampshire-specific considerations to the contrary, I predict that New Hampshire would recognize cross-jurisdictional tolling under *American Pipe*.

Accordingly, Amazon's motion to dismiss the claims under New Hampshire's antitrust statute is DENIED.

### c.   Rule of Reason

Plaintiffs assert the New Hampshire antitrust statute explicitly prohibits vertical price-fixing agreements, and that therefore the per se standard applies.  (Opp'n 19–20 (citing, *inter alia*, NH Rev. Stat. §§ 356:1, 356:2 (1996)).)  Specifically, Section 356:2 prohibits "[e]very contract, combination, or conspiracy" that "has the purpose or the effect of . . . [f]ixing, controlling, or maintaining prices, rates, quotations or fees in any part of trade or commerce." Further, Section 356:14 states that "courts may be guided by interpretations of the United States' antitrust laws."  The permissive language of "may" contrasts with, for example, its Nevada counterpart, which requires harmonization.  *Compare id.* § 356:14, *with* Nev. Rev. Stat. § 598A.050.  Despite this permissive language, this section, according to the New Hampshire Supreme Court, indicates that the state "legislature expressly encouraged a uniform construction with federal antitrust law."  *Minuteman, LLC v. Microsoft Corp.*, 795 A.2d 833, 836 (N.H. 2002) (citation omitted).  Indeed, the only two state court opinions, both unpublished opinions in 1988 from the Superior Court of New Hampshire, that have referenced the rule of reason have looked to U.S. Supreme Court decisions interpreting the Sherman Act.  *See Am. Surgicare, Inc. v. Hollister, Inc.*, No. 81-E-356, 1988 WL 247967, at *7 (N.H. Super. June 27, 1988); *Am. Surgicare, Inc. v. Hollister, Inc.*, No. 81-E-356, 1988 WL 247966, at *4 (N.H. Super. Jan. 8, 1988).[33]  In both opinions, the Superior Court of New Hampshire recognized that interpretations of the New Hampshire antitrust statute "are guided by" the federal antitrust laws and "the case law relative thereto."  *Hollister, Inc.*, 1988 WL 247967, at *6; *Hollister, Inc.*, 1988 WL 247966, at *3 (same).

Although this is a close call, I hold that Plaintiffs' claims under the New Hampshire

---

[33] The June 27, 1988 opinion seems to be an amended or supplemental version of the January 8, 1988 opinion.

antitrust statute should be subject to the rule of reason.  Section 356:2's explicit prohibition of price fixing does not necessarily render Plaintiffs' claim to be subject to the per se standard.  In *Hollister*, the Superior Court of New Hampshire analyzed different subsections of Section 356:2.II, specifically subsections (c) and (d).  *Hollister, Inc.*, 1988 WL 247967, at *6. Subsection (c) prohibits agreements related to "[a]llocating or dividing customers or markets in any part of trade or commerce," while subsection (d) prohibits agreements related to "[r]efusing to deal, or coercing, persuading or inducing any person to refuse to deal, with another person." *See* N.H. Rev. Stat. §§ 356:2.II.(c)–(d).  Even though the federal Sherman Act does not have similar prohibitions, the Superior Court of New Hampshire still looked to *Continental T.V., Inc.*, where the U.S. Supreme Court held that a manufacturer's agreement with distributors and retailers to control product distribution is evaluated under the rule of reason.  *Hollister, Inc.*, 1988 WL 247967, at *7 (citing *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977)). The New Hampshire Superior Court did not find it dispositive that the New Hampshire antitrust statute's text contained clauses that are not present in the Sherman Act, and held that the rule of reason applied for claims under subsections (c) and (d) under Section 356:2.II.  *Id.*  Similarly, I hold that Section 356:2.II(a)'s prohibition of price fixing should be interpreted in light of the federal caselaw interpreting the federal antitrust laws, namely *Leegin*, and therefore hold that the rule of reason applies.

### ii.  *Consumer Protection Claims*

Amazon also argues that, under the New Hampshire Consumer Protection Act ("CPA"), the FAC fails to allege any unlawful conduct occurring in New Hampshire.  (MTD Br. 28–29 (citing numerous federal cases including *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2014 WL 4955377, at *22 (N.D. Cal. Oct. 2, 2014)).)  Plaintiffs seem to concede that the

alleged conduct did not occur in New Hampshire, but argue that the CPA nevertheless applies to "anticompetitive conduct [that] *affected* commerce in and the citizens of New Hampshire." (Opp'n 26 (emphasis added).)  Plaintiffs cite to the New Hampshire Supreme Court's instruction that the CPA "generally is given broad sweep."  (*Id.* (quoting *LaChance v. U.S. Smokeless Tobacco Co.*, 931 A.2d 571 (N.H. 2007)).)  Amazon retorts that *LaChance* is "off the mark" and that it did not hold that that the CPA applies to conduct occurring outside of New Hampshire. (Reply 16.)

The CPA prohibits "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  N.H. Rev. Stat. § 358-A:2. The CPA defines "trade" and "commerce" to include the sale or distribution of "any services and any property," to be inclusive of "any trade or commerce directly or indirectly affecting the people of this state."  *Id.* § 358-A:1.  The citations provided by the parties show a split in the caselaw regarding whether the CPA covers conduct occurring outside of New Hampshire if the conduct affects the people of New Hampshire.  (*Compare* MTD Br. 28–29 (citing federal cases in New Hampshire and the Northern District of California), *with* Opp. 26–27 (citing federal cases in the Southern District of New York, the Northern District of Illinois, Eastern District of Virginia, Middle District of Pennsylvania, and the Southern District of California).)

I agree with Amazon's interpretation of the CPA.  The Supreme Court of New Hampshire has previously "held that the scope of the CPA is narrower than its broad language may suggest."  *Ellis v. Candia Trailers & Snow Equip., Inc.*, 58 A.3d 1164, 1171 (N.H. 2012) (citing *Hughes v. DiSalvo*, 729 A.2d 422 (N.H. 1999)).  Further, although *LaChance* may have recognized the broad remedial purpose of the CPA, it did not necessarily hold that the CPA prohibits conduct occurring outside of New Hampshire.  *See Lithium*, 2014 WL 4955377, at *22

("The *LaChance* court did not say, nor does it[] suggest, that the CPA applies to proscribed conduct occurring out of state." (citation omitted)); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1159 (N.D. Cal. 2009) (*LaChance* "does not, as Plaintiffs suggest, address the requirement that the offending conduct occur within the state.").  Some judges in the federal District Court of New Hampshire agree and hold that the CPA does not cover conduct occurring out of New Hampshire.  *See, e.g.*, *Province Lake Golf Enters., Inc. v. Phila. Indem. Ins. Co.*, No. 20-CV-309, 2020 WL 3799229, at *6 (D.N.H. July 7, 2020) (dismissing action because no allegation that "offending conduct occurred in New Hampshire"); *Wilcox Indus. Corp. v. Hansen*, 870 F. Supp. 2d 296, 305 (D.N.H. 2012) ("There is simply no allegation that any offending conduct occurred in New Hampshire.").

Here, because the state courts do not seem to have settled the legal issue and the parties cite competing federal court opinions, I "defer to the state law rulings of a federal district court sitting in the state whose law is controlling." *Dahlberg v. Harris*, 916 F.2d 443, 445 (8th Cir. 1990) (citation omitted); *see also Nat'l Fire Ins. Co. v. Hous. Dev. Co.*, 827 F.2d 1475, 1480 (11th Cir. 1987) ("[T]he interpretation of state law by a federal district judge sitting in that state is entitled to deference." (internal quotation marks omitted)).  *Cf. Gregory v. Navigators Ins. Co.*, No. 23-17-CV, 2023 WL 8538173, at *2 (2d Cir. Dec. 11, 2023) (summary order) ("This Court generally defers to interpretations of state law by the federal court of appeals covering that state." (citations omitted)); *United States v. Cavazos*, 950 F.3d 329, 335 (6th Cir. 2020) ("[W]e normally defer to other federal courts of appeals for interpretation of the laws of the states within their boundaries." (citation omitted)).  I therefore hold that the CPA does not cover conduct occurring outside of New Hampshire.

Accordingly, Amazon's motion to dismiss Plaintiffs' claims under the New Hampshire

Consumer Protection Act is GRANTED and those claims are DISMISSED.[34]

### r. New Mexico

#### i. *Antitrust Standing*

The parties do not dispute that New Mexico would apply the *AGC* factors.  (*See* Opp'n 17 (listing states that Plaintiffs dispute would adopt *AGC*).)  Because I find that Plaintiffs have antitrust standing under *AGC*, I therefore find that they have antitrust standing under New Mexico law.

#### ii. *Timeliness*

Amazon contends that Plaintiffs' claims should be limited to those between November 2018 and March 2019 due to New Mexico's four-year statute of limitations.  (MTD Br. 38 & n.25.)  Plaintiffs argue that that New Mexico state courts would adopt both *American Pipe* tolling and cross-jurisdictional tolling because New Mexico's jurisprudence regarding class actions aligns itself with federal law.  (Opp'n 38–39.)  The Court of Appeals of New Mexico has stated that the state rule governing class actions "is essentially identical to its federal counterpart, Rule 23(b) of the Federal Rules of Civil Procedure," and that the state courts "may look to federal law for guidance in determining the appropriate legal standards to apply under these rules."  *Romero v. Philip Morris Inc.*, 2005-NMCA-035, ¶ 35, 109 P.3d 768, 777 (N.M. Ct. App. 2005) (citations omitted).  Given this jurisprudence—and the fact that Amazon does not dispute otherwise—I assume that New Mexico has adopted *American Pipe* tolling.

Amazon argues that any adoption of *American Pipe* tolling does not, by itself, "warrant[] extension of cross-jurisdictional class action tolling to a state that has not adopted it."  (Reply

---

[34] Because I dismiss Plaintiffs' claims under the New Hampshire Consumer Protection Act, I decline to and need not address whether those claims are time barred by the statute of limitations.

18.)  However, as I have explained above, if a state has adopted *American Pipe* tolling—which I assume here because Amazon does not argue that New Mexico courts rejected *American Pipe* tolling[35]—I presume that they would adopt cross-jurisdictional tolling absent state-specific considerations.  *LIBOR*, 2015 WL 4634541, at *129.  Because I find no New Mexico-specific considerations to the contrary, I predict that New Mexico would recognize cross-jurisdictional tolling under *American Pipe*.

Accordingly, Amazon's motion to dismiss the claims under New Mexico law is DENIED.

### s.   New York[36]

#### i.   *Antitrust Standing*

Amazon argues no antitrust standing under New York law because it adopted *AGC*. Assuming, in Amazon's favor, that New York adopts *AGC*, Plaintiffs have adequately pled antitrust standing under *AGC*, so they have antitrust standing under New York law as well.

#### ii.   *The Donnelly Act*

Amazon contends that the Donnelly Act—New York's antitrust law—does not cover unilateral conduct, as alleged here.  (MTD Br. 27–28.)  Specifically, Amazon asserts that the PPR was a part of Amazon's terms and conditions, and the TPS' agreement to the PPR did not constitute "concerted action" under the law.  (*Id.* at 28.)  According to Amazon, "one party's establishment or enforcement of contract terms that another party is required to follow" does not

---

[35] Amazon only argues that (1) *American Pipe* tolling does not apply in this action more broadly, and (2) New Mexico courts do not adopt cross-jurisdictional tolling.  (MTD Br. 36–39.)  I find that, because Amazon failed to argue that New Mexico courts do not adopt *American Pipe tolling*, it abandoned that argument.  *See Jackson*, 766 F.3d at 196 ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended.").

[36] Amazon does not present any timeliness argument regarding Plaintiffs' claims under New York law.

constitute concerted action.  (*Id.* (citations omitted).)

The New York Court of Appeals has likened the Donnelly Act to "its essentially similar federal progenitor, section 1 of the Sherman Act."  *Glob. Reinsurance Corp. U.S. Branch v. Equitas Ltd.*, 969 N.E.2d 187, 192 (N.Y. 2012) (internal citations omitted).  Indeed, an antitrust claim under either Act "must allege both concerted action by two or more entities and a consequent restraint of trade within an identified relevant product market."  *Id.* (internal citations omitted).  As relevant here, "the pertinent inquiry in determining whether there is concerted or unilateral activity is one of substance and not form."  *Id.* at 193 (citing *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010)).  Accordingly, I look to federal interpretation of section 1 of the Sherman Act as guidance in determining how to predict how the New York Court of Appeals would act.

Amazon cites *Baar v. Jaguar Land Rover North America, LLC*—an out-of-circuit, non-binding case—where car-manufacturer defendants established a no-export agreement at point of sale against their dealers, and enforced that agreement with potential penalties and termination. 295 F. Supp. 3d 460, 465 (D.N.J. 2018). (internal quotation marks omitted).  The trial court dismissed the Sherman Act claims for, among other reasons, failure to allege concerted action. *Id.* at 464–65.  In doing so, the court relied on *Monsanto*, where the Supreme Court stated that a manufacturer "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."  *Id.* (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)).  The *Baar* court also relied on a Sixth Circuit case recognizing the then-current Department of Justice guidelines that allowed manufacturers "to unilaterally impose appropriate restraints."  *Id.* (quoting *Int'l Logistics Grp., Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989)).

*Baar* is distinguishable because it, as well as the two cases it cites, involved a policy enforced by a manufacturer against its distributors or dealers.  Indeed, the DOJ guidelines that the Sixth Circuit relied on in *International Logistics Group* stated that "it is inappropriate to consider *intraband* restraints as 'agreements,'" in the Sherman Act analysis.  884 F.2d at 907 (emphasis added).  Plaintiffs' allegations here do not involve a manufacturer's enforcement of its contract on downstream distributors or dealers.  The situation in *Baar* and the two cases it cites are unlike the one here where Amazon, which allegedly wields substantial market power as both distributor and competitor, imposes and enforces the PPR.  Amazon's unique position in the online retail system coupled with the PPR's broad reach to each TPS's contractual relations with non-Amazon distributors do not render the PPR the kind of "intraband restraint" that is immune from Sherman Act liability.

Amazon's reliance on *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal. 2012), fares no better.  There, plaintiffs made a group-boycott claim under Section 1 of the Sherman Act, and alleged that defendant Facebook's contract with application developers required them to use only pre-approved advertising partners.  *Id.* at 1076.  The court held that the plaintiffs had failed to allege a concerted effort among Facebook and the application developers, and had instead only alleged "unilateral action on the part of Facebook." *Id.* (citations omitted).  In contrast, the PPR is not a one-time unilateral action from Amazon; rather, the mechanism of the PPR forces each TPS to make pricing decisions actively, thereby reflecting a "conscious commitment to a common scheme designed to achieve an unlawful objective" of price-fixing.  *Monsanto*, 465 U.S. at 753.

Amazon's reliance on *Toscano v. Professional Golfers Association*, 258 F.3d 978 (9th Cir. 2001), is also misplaced.  (*See* MTD Br. 28.)  There, local sponsors entered into contracts

with the Professional Golfers Association ("PGA Tour") where they "agreed to purchase a product." *Toscano*, 258 F.3d at 984.  In finding no concerted action, the Ninth Circuit likened these contracts to those in other cases where "defendants merely agreed to purchase products or provide a service conditions set by the other party." *Id.*  (citing *Am. Airlines v. Christensen*, 967 F.2d 410, 413–14 (10th Cir. 1992); *Buetler Sheetmetal Works v. McMorgan & Co.*, 616 F. Supp. 453, 456 (N.D. Cal. 1985)).  Notably, the Ninth Circuit stated that the local sponsors "acted independently of the PGA Tour and of one another," and that the local sponsors' agreements to the contracts were not agreements to "use [the PGA Tour's rules and regulations] to restrain trade." *Id.*  As discussed, the TPSs here did not act independently of Amazon, and, in a concerted effort, continually made pricing considerations and decisions in a common scheme in furtherance of a price-fixing scheme.

Indeed, the *De Coster* court squarely rejected the same argument by Amazon.  The Court denied Amazon's motion to dismiss and held that "Amazon has failed to demonstrate a lack of concerted action, or that concerted action is implausible."  *De Coster*, 2023 WL 372377, at *4. Specifically, the court construed the operative complaint "in the light most favorable to Plaintiffs" and stated that "the third-party merchants are active participants who set their prices and otherwise engage with Amazon's policies in an active, albeit allegedly unwilling, way." *Id.* And in *United States v. Delta Dental of Rhode Island*, the plaintiff's allegations of dentists' explicit agreement to comply with certain contracts containing a most-favored-nation clause sufficiently constituted "concerted action" under Section 1 of the Sherman Act.  943 F. Supp. 172, 175 (D.R.I. 1996).  These cases suggest that the TPSs' agreement to the PPR, which was heavily enforced by Amazon, plausibly could constitute "concerted action" under the Sherman Act and the Donnelly Act.  Amazon does not cite to any binding case law directly on point.

Although *De Coster* is not binding, the facts of that case are analogous to the facts here.  The facts alleged here, construed in the light most favorable to Plaintiffs, demonstrate the PPR to be an agreement between Amazon and the TPSs—Amazon in establishing the PPR and the TPSs in agreeing to it—to engage in an arrangement where, in exchange for being able to use the Amazon Platform, the TPSs agree to be bound by certain conditions, including the PPR.

Accordingly, Amazon's motion to dismiss the claims under New York law is DENIED.

### t.    North Carolina[37]

Amazon argues no antitrust standing under North Carolina law because (1) it adopted *AGC* and (2) proximate causation is required.  (MTD Br. 14, 16, 20.)  I disagree.  Although the North Carolina Supreme Court has not decided this issue, the North Carolina Court of Appeals has held that indirect purchasers have standing under the state antitrust statute, *Hyde v. Abbott Lab'ys, Inc.*, 123 473 S.E.2d 680, 688 (N.C. Ct. App. 1996), and that "the *AGC* factors do not apply in determining which indirect purchasers have standing to sue under the North Carolina antitrust statutes," *Teague v. Bayer AG*, 671 S.E.2d 550, 557 (N.C. Ct. App. 2009).

Here, *Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*, is instructive.  No. 16- CVS-16404, 2017 WL 1359599 (N.C. Super. Apr. 11, 2017).  In that case, the Superior Court held that plaintiffs had sufficiently alleged antitrust standing based on several considerations.  *Id.* at *7.  One consideration was that the Superior Court interpreted *Teague* to hold that plaintiffs are not required "to prove a causal chain between" the alleged misconduct and injury at the pleading stage.  *Id.* at *8 (citing *Teague*, 671 S.E.2d at 557–58).  Another consideration was that, although antitrust cases involving indirect purchasers "will often involve complicated causation and damages issues," those burdens are not sufficient to require dismissal at the pleading stage.  *Id.* at

---

[37] Amazon does not present any timeliness argument regarding Plaintiffs' claims under North Carolina law.

*12.  Notably, the Superior Court rejected the argument that plaintiffs lacked standing because their injury was "the result of the independent action of" other entities.  *Id.* at *9.  Here, although Plaintiffs are not indirect purchasers and are instead purchasers from non-Amazon Platforms, I do not find that they lack antitrust standing at the pleading stage.  North Carolina courts have a more expansive view of antirust standing than the federal courts do, and the complexities in the causation and damages analysis required at a later stage of litigation do not justify dismissal at the pleading stage.

Accordingly, Amazon's motion to dismiss the claims under North Carolina law is DENIED.

### u.  North Dakota

#### i.  *Antitrust Standing*

Amazon argues no antitrust standing under North Dakota law because (1) it adopted *AGC* and (2) non-purchasers do not have standing.  (MTD Br. 14, 17, 22.)  Amazon's first argument fails because, assuming, in Amazon's favor, that North Dakota adopts *AGC*, Plaintiffs have adequately pled antitrust standing under *AGC*.

As to the second argument, Amazon cites to a federal court decision *Oliver*, 2021 WL 386749, at *7, which in turn cited another federal court decision, *Beckler v. Visa U.S.A. Inc.*, No. Civ. 09-04-C-0030, 2004 WL 2475100, at *4 (N.D. Dist. Sept. 21, 2004).  Plaintiffs contend that neither the text of the North Dakota statute nor the cases Amazon cites broadly precludes non-purchasers from having antitrust standing.  (Opp'n 18.)  In reply, Amazon merely cites *Beckler* again, which relied on *AGC* in concluding no antitrust standing.  (Reply 11.)

Here, Amazon fails to demonstrate that non-purchasers do not have standing under North Dakota law.  As an initial matter, Amazon melds its argument regarding non-purchasers lacking

standing with its argument regarding North Dakota's adoption of *AGC*.  (*See* Reply 9 n.4 ("No matter how the rule is characterized in these cases, the case law in . . . North Dakota . . . has applied the *AGC* factors to reject non-purchaser standing.").)  I have already ruled on the *AGC* issue, assuming, in Amazon's favor, that North Dakota adopted *AGC*.

Amazon's citation to the federal court decision in *Oliver* is not dispositive.  There, the court noted that plaintiffs "fail[ed] to engage with . . . *Beckler*, . . . or [any other] . . . North Dakota case law."  *Oliver*, 2021 WL 386749, at *7.  The *Oliver* court accordingly did not analyze other state statutes or case law and summarily granted the defendant's motion for judgment on the pleadings as to plaintiffs' North Dakota antitrust law claims.  Admittedly, Plaintiffs here also fail to engage with *Beckler* or other state law.  Even still, neither *AGC* nor *Beckler*—which relied on *AGC*—nor any other authority I am aware of, broadly prohibits antitrust standing from non-purchasers.

Without more guidance, I cannot find that the North Dakota Supreme Court would categorically preclude non-purchasers from having antitrust standing.

### ii.  *Timeliness*

Amazon argues Plaintiffs' claims should be limited to those between November 2018 and March 2019 due to North Dakota's four-year statute of limitations.  (MTD Br. 38 & n.25.)  Plaintiffs argue that that North Dakota state courts would adopt both *American Pipe* tolling and cross-jurisdictional tolling because North Dakota's jurisprudence regarding class actions aligns itself with federal law.  (Opp'n 38–39 (citing *Baker v. Autos, Inc.*, 860 N.W.2d 788, 805 (N.D. 2015)).)  Given this jurisprudence—and the fact that Amazon does not dispute otherwise—I assume that North Dakota has adopted *American Pipe* tolling.

Amazon argues that any adoption of *American Pipe* tolling does not, by itself, "warrant[]

extension of cross-jurisdictional class action tolling to a state that has not adopted it." (Reply 18.) However, as I have explained above, if a state has adopted *American Pipe* tolling—which I assume here—I presume that they would adopt cross-jurisdictional tolling absent state-specific considerations. *LIBOR*, 2015 WL 4634541, at *129. Because I find no North Dakota-specific considerations to the contrary, I predict that North Dakota would recognize cross-jurisdictional tolling under *American Pipe*.

Accordingly, Amazon's motion to dismiss the claims under North Dakota law is DENIED.

### v.  Oregon

#### i.  *Antitrust Standing*

The parties do not dispute that Oregon would apply the *AGC* factors. (*See* Opp'n 17 (listing states that Plaintiffs dispute would adopt *AGC*).) Because I find that Plaintiffs have antitrust standing under *AGC*, I therefore find that they have antitrust standing under Oregon law.

#### ii.  *Timeliness*

Amazon argues Plaintiffs' claims should be limited to those between November 2018 and March 2019 due to Oregon's four-year statute of limitations. (MTD Br. 38 & n.25.) Amazon concedes that Oregon has adopted *American Pipe* tolling. (*See* Reply 17–18 & n.10 (citing *Bergquist v. Int'l Realty, Ltd.*, 537 P.2d 553 (Or. 1975) (en banc)).) Instead, Amazon argues that adoption of *American Pipe* tolling does not, by itself, "warrant[] extension of cross-jurisdictional class action tolling to a state that has not adopted it." (*Id.* at 18.)

As I noted, whether a state court adopts *American Pipe* tolling is distinct from the issue of whether it would adopt cross-jurisdictional tolling. However, because I do not find any authority that indicates that Oregon would not adopt cross-jurisdictional tolling, I predict that

Oregon would recognize cross-jurisdictional tolling under *American Pipe*.  *See Torch v. Windsor Surry Co.*, No. 3:17-CV-00918, 2019 WL 6709379, at *7 (D. Or. Dec. 9, 2019) ("Plaintiffs have cited no law, and I am aware of none, suggesting that the Oregon courts would apply *American Pipe* tolling differently depending upon whether the prior class action was filed in a foreign federal or state court.").[38]

Accordingly, Amazon's motion to dismiss the claims under Oregon law is DENIED.

### w.  Rhode Island[39]

The parties do not dispute that Rhode Island would apply the *AGC* factors.  (*See* Opp'n 17 (listing states that Plaintiffs dispute would adopt *AGC*).)  Because I find that Plaintiffs have antitrust standing under *AGC*, I therefore find that they have antitrust standing under Rhode Island law.  Amazon's motion to dismiss the claims under Rhode Island law is DENIED.

### x.  South Dakota[40]

The parties do not dispute that South Dakota would apply the *AGC* factors.  (*See* Opp'n 17 (listing states that Plaintiffs dispute would adopt *AGC*).)  Because I find that Plaintiffs have antitrust standing under *AGC*, I therefore find that they have antitrust standing under South Dakota law.  Amazon's motion to dismiss the claims under South Dakota law is DENIED.

### y.  Tennessee[41]

Amazon argues that the claims are completely time barred due to a 3-year statute of

---

[38] The court in *Torch* predicted that even if Oregon state courts were to adopt cross-jurisdictional tolling, such tolling would not apply in that case under *China Agritech* because "plaintiffs have filed a subsequent class action, not subsequent individual claims."  *Torch*, 2019 WL 6709379, at *7.  However, as I explained, *China Agritech*'s bar is not applicable here because class certification had not been resolved at the time this action was initiated.  *See supra* at 31.

[39] Amazon does not present any timeliness argument regarding Plaintiffs' claims under Rhode Island law.

[40] Amazon does not present any timeliness argument regarding Plaintiffs' claims under South Dakota law.

[41] Amazon does not dispute antitrust standing under Tennessee law.  (MTD Br. 23 n.11.)

limitations.  (MTD Br. 32 & n.19.)  Plaintiffs acknowledge that the Supreme Court of Tennessee

has declined to recognize cross-jurisdictional tolling in a products liability case.  (Opp'n 39.)

After recognizing that state and federal courts were split in adopting cross-jurisdictional tolling

as well as the policy concerns underlying cross-jurisdictional tolling, the Tennessee Supreme

Court declined to recognize cross-jurisdictional tolling.  *Maestas v. Sofamor Danek Grp., Inc.*,

33 S.W.3d 805, 808 (Tenn. 2000).  Even as the Court conceded that its holding may "promote

'protective' filings by plaintiffs" to preserve timely claims, those concerns were outweighed by

the risk of inviting litigation that would otherwise have been filed in other states and thereby

encouraging forum shopping.  *Id.* at 808–09.  The Court noted that the Tennessee state courts

could stay the state case until the question of class certification was resolved.  *Id.* at 809.  I find

that the holding and policy considerations in *Maestas* were not limited to the facts and

circumstances of products liability cases.  Indeed, the Tennessee Supreme Court subsequently

reiterated these policy considerations in the context of breach-of-contact and wrongful-discharge

claims.  *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 33 (Tenn. 2007).  I, therefore, extend the

holding and policy considerations in *Maestas* to antitrust claims, including those here.

Accordingly, Amazon's motion to dismiss the claims under Tennessee law is GRANTED

as untimely.[42]

> **z.**   Utah[43]

Amazon claims there is no antitrust standing under Utah law because (1) proximate

causation is required and (2) at least one named plaintiff must be a Utah citizen or resident under

the Utah Antitrust Act.  (MTD Br. 20–22, 30.)  With regard to the first argument, Plaintiffs aver

---

[42] Because I find that Plaintiffs' claims under Tennessee law are untimely, I decline to address whether the PPR constitutes unilateral conduct not actionable under Tennessee law or whether the per se standard applies.

[43] Amazon does not present any timeliness argument regarding Plaintiffs' claims under Utah law.

that Amazon's arguments regarding proximate causation fail because they incorrectly assume that Plaintiffs rely on the umbrella theory.  (Opp'n 17–18.)  I am not aware of any decision from the Utah Supreme Court concerning whether the state statute's requirement of proximate causation is identical to that of the first *AGC* factor.  Amazon suggests that they are.  (*See* MTD Br. 20–22.)  Assuming, in Amazon's favor, that the requirement is identical, because I have found that Plaintiffs have adequately pled the first *AGC* factor, Amazon's proximate-causation argument fails.

With regard to the second argument, the Utah Antitrust Act ("UAA") provides, in relevant part:  "A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant."  Utah Code § 76-16-511(1)(a)(i).[44]  The Amended Complaint states that "Utah Class members, who are either Utah residents or Utah citizens, have standing to sue as individuals who have been injured, directly or indirectly, by Amazon's conduct."  (Am. Compl. ¶ 334.)

The issue is whether at least one named plaintiff must be a Utah citizen or resident.  Plaintiffs do not dispute that neither named Plaintiff is a Utah citizen or resident; rather, Plaintiffs deny that this is a requirement under the UAA.  (Opp'n 27.)  Neither party cites to any Utah state court decision on this issue, and instead each cite several federal cases in support of their respective arguments.  (*Compare* MTD Br. 30, *with* Opp'n 27–28.)  Although Amazon relies heavily on *Effexor*, (*see* MTD Br. 30), which stated that "[t]he majority of courts that have

---

[44] Plaintiffs cite Utah Code §§ 76-10-911, et seq. in the First Amended Complaint.  (FAC ¶¶ 329–336.)  These laws were then renumbered as § 76-16-511, effective May 7, 2025.

been presented with this statute require at least one Utah citizen or resident be a named plaintiff, *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 393 (D.N.J. 2018) (collecting cases), Plaintiffs cite four federal cases—which were all decided after *Effexor*—that came to the opposite conclusion, (*see* Opp'n 27–28).  True, some federal courts have more recently agreed with Amazon's argument.  *See, e.g.*, *Mass. Laborers' Health & Welfare Fund v. Boehringer Ingelheim Pharms., Inc.*, 783 F. Supp. 3d 417, 445 (D. Mass. 2025) (requiring named plaintiffs to be citizens or residents of Utah); *In re Amitiza Antitrust Litig.*, No. 21-CV-11057, 2024 WL 4250224, at *13 (D. Mass. Aug. 21, 2024) (recommending the same), *report and recommendation adopted as modified*, 2024 WL 4344887 (D. Mass. Sept. 30, 2024).  However, it is clear that no Utah state court has decided this issue.  Nor has either the District Court for the District of Utah or the Tenth Circuit opined on this issue.

I agree with Plaintiffs that, at least at the motion-to-dismiss stage, the UAA does not require a named plaintiff to be a citizen or resident of Utah.  The statutory text is silent on such a requirement, and Plaintiffs fail to demonstrate why I should read one into the statute at this stage of the proceedings.[45]  At this juncture, Plaintiffs' claims that putative class members include Utah citizens or residents are sufficient to survive a motion to dismiss.  *In re Zetia (Ezetimibe) Antitrust Litig.*, 400 F. Supp. 3d 418, 435 (E.D. Va. 2019) (collecting cases).[46]

---

[45] *See, e.g.*, *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 629 (N.D. Cal. 2020).  In declining to require a named plaintiff to be a citizen or resident of Utah, *Staley* relied on a Ninth Circuit decision that held that "once a named plaintiff demonstrates individual standing for a claim, the standing inquiry is satisfied and any issue regarding the relationship between the named plaintiff and the members of the putative class is relevant only to class certification, not standing." *Id.* at 622, 629 (citing *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015)).

[46] Assuming Plaintiffs do not amend the operative complaint to include a Utah resident or citizen as a named plaintiff, Amazon's arguments may be more successful at a later stage in this action, such as class certification.  *See Hosp. Auth. of Metro. Gov't of Nash. v. Momenta Pharms., Inc.*, 353 F. Supp. 3d 678, 696 (M.D. Tenn. 2018) ("Defendants essentially raise the issue of whether Plaintiffs have standing to pursue the Utah antitrust claim, and, as noted above, this issue is better decided at the class certification state.").  Based on the statutory text, "[t]he remedy is, however, restricted to citizens and residents of Utah."  *Staley*, 446 F. Supp. 3d at 629.

Accordingly, Amazon's motion to dismiss the claims under Utah law is DENIED.

**aa.** <u>Vermont</u>

**i.** *Antitrust Standing*

Amazon relies primarily on a Vermont trial court decision applying the *AGC* factors to support its argument that non-purchasers do not have standing.  (MTD Br. 22 (citing *Fucile v. Visa U.S.A., Inc.*, No. S1560–03, 2004 WL 3030037, at *3 (Vt. Super. Ct. Dec. 27, 2004)).) Plaintiffs respond by arguing neither the text of the state antitrust statute nor the cases Amazon cites broadly prohibit antitrust standing for non-purchasers.  (Opp'n 18.)  Further, the trial court in *Fucile* applied the *AGC* factors, which do not help Amazon here.  *See Fucile*, 2004 WL 3030037, at *3 (applying the *AGC* factors).

Amazon again seems to meld its argument regarding non-purchasers lacking standing with its argument regarding Vermont's adoption of *AGC*.  (*See* Reply 9 n.4 ("No matter how the rule is characterized in these cases, the case law in . . . Vermont has applied the *AGC* factors to reject non-purchaser standing.").)  Assuming, in Amazon's favor, that Vermont adopts *AGC*, Plaintiffs have adequately pled antitrust standing under *AGC*, so they have antitrust standing under Vermont law as well.

**ii.** *Timeliness*

Amazon argues Plaintiffs' claims should be limited to those between November 2016 and March 2019 due to Vermont's six-year statute of limitations.  (MTD Br. 40 & n.27.)  Amazon concedes that Vermont has adopted *American Pipe* tolling.  (*See* Reply 17–18 & n.10 (citing *Salatino v. Chase*, 939 A.2d 482 (Vt. 2007)).)  However, Amazon argues that adoption of *American Pipe* tolling does not, by itself, "warrant[] extension of cross-jurisdictional class action tolling to a state that has not adopted it."  (*Id.* at 18.)  Plaintiffs argue that the Supreme Court of

Vermont approved of *American Pipe* tolling, and that therefore it is likely that Vermont would adopt cross-jurisdictional tolling as well.  (Opp'n 38.)

As I noted, whether a state court adopts *American Pipe* tolling is distinct from the issue of whether it would adopt cross-jurisdictional tolling.  However, because I do not find any authority that indicates that Vermont would not adopt cross-jurisdictional tolling, I predict that Vermont would recognize cross-jurisdictional tolling under *American Pipe*.

Accordingly, Amazon's motion to dismiss the claims under Vermont law is DENIED.

### bb. West Virginia[47]

#### i. *Antitrust Standing*

Amazon argues no antitrust standing under West Virginia law because it must be interpreted to be in harmony with federal antitrust law.  Assuming, in Amazon's favor, that West Virginia adopts *AGC*, Plaintiffs have adequately pled antitrust standing under *AGC* so they have antitrust standing under West Virginia law as well.  Accordingly, Amazon's motion to dismiss the claims under West Virginia law is DENIED.

#### ii. *Rule of Reason*

The West Virginia Antitrust Act ("WVAA") prohibits, in relevant part, "[a] contract, combination or conspiracy between two or more persons . . . controlling or maintaining the market price, rate or fee of the commodity or service."  W. Va. Code § 47-18-3(b)(1)(B).  Amazon argues that under the WVAA's mandatory harmonization statute—which provides that the WVAA "shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes," W. Va. Code § 47-18-16—I should look to federal precedent holding that vertical agreements were subject to the rule of reason.  (Reply 15 (citing

---

[47] Amazon does not present any timeliness argument regarding Plaintiffs' claims under West Virginia law.

*Stand Energy Corp. v. Columbia Gas Transmission Corp.*, No. 2:04–0867, 2008 WL 3891219, at *13 (S.D.W. Va. Aug. 19, 2008)).)  Plaintiffs assert that the WVAA is "[u]nlike Section 1 of the Sherman Act" because the WVAA explicitly prohibits vertical price-fixing agreements, and that I should therefore not look to federal precedent.  (Opp'n 19–22 (citing, *inter alia*, W.Va. Code, § 47-18-3).)

Plaintiffs' argument is foreclosed by West Virginia's highest court when it held that "W. Va. Code § 14–18–3(b) is comparable to Section 1 of the Sherman Act."  *Kessel v. Monongalia Cnty. Gen. Hosp. Co.*, 648 S.E.2d 366, 379 (W. Va. 2007).  That court noted that the Sherman Act was enacted 88 years before the WVAA, and presumed that the state "[l]egislature knew the scope of federal antitrust law and the terms of art utilized therein at the time it enacted the [WVAA] and directed its construction in harmony with federal law."  *Id.* at 376.  The court then inquired "whether the provisions of W. Va. Code § 47–18–3(b) evidenced an intent by the Legislature to depart from federal antitrust law . . . or whether the provisions of W. Va. Code § 47–18–3(b) are simply a codification of federal judicial decisions setting forth conduct deemed to be *per se* violations of Section 1 of the Sherman Act."  *Id.*  The court held that it was the latter. *Id.* at 378 ("After exhaustive examination and consideration of the United States Supreme Court Sherman Act cases cited above and their progeny, this Court believes that the Legislature intended to codify certain activities deemed under federal law to be *per se* violations of Section 1 of the Sherman Act as *per se* violations of the [WVAA].").  Having found that the two laws were "comparable," the court then held that the West Virginia courts should "apply federal decision law relative to *per se* violations of Section 1 of the Sherman Act in determining the scope of activities constituting *per se* violations of the [WVAA]."  *Id.* at 380.

Here, applying the U.S. Supreme Court's decision in *Leegin*, I hold that Plaintiffs' claims

of a vertical restraint in violation of the WVAA are subject to the rule of reason.  The court in *Kessel* stated that the West Virginia courts should continue to look to federal interpretations of the Sherman Act, even after the codification of then-existing precedent into W. Va. Code § 47–18–3(b).  *See id.*  It stands to reason that West Virginia courts would look to *Leegin*, and similarly hold that the allegations of a vertical restraint are subject to the rule of reason.  Accordingly, I hold that Plaintiffs' claims under West Virginia's antitrust statute can proceed under the rule of reason standard.

### cc. Wisconsin

#### i. *Antitrust Standing*

Amazon argues no antitrust standing under Wisconsin law because it adopted *AGC*.  (MTD Br. 14, 17.)  Assuming, in Amazon's favor, that Wisconsin adopts *AGC*, Plaintiffs have adequately pled antitrust standing under *AGC*, so they have antitrust standing under Wisconsin law as well.

#### ii. *Timeliness*

Next, Amazon argues Plaintiffs' claims should be limited to those between November 2016 and March 2019 due to Wisconsin's six-year statute of limitations.  (MTD Br. 40 & n.27.)  Plaintiffs argue that that Wisconsin state courts would adopt both *American Pipe* tolling and cross-jurisdictional tolling because Wisconsin's jurisprudence regarding class actions aligns itself with federal law.  (Opp'n 38–39 (quoting *Rave v. SVA Healthcare Servs.*, 2021 WI App. 36, n.1, 960 N.W. 2d 631 (Wis. Ct. App. 2021)).)  Given this jurisprudence—and the fact that Amazon does not dispute otherwise—I assume that Wisconsin has adopted *American Pipe* tolling.  However, Amazon argues that adoption of *American Pipe* tolling does not, by itself, "warrant[] extension of cross-jurisdictional class action tolling to a state that has not adopted it."

(Reply 18.)

As I noted, whether a state court adopts *American Pipe* tolling—which is arguable here— is distinct from the issue of whether it would adopt cross-jurisdictional tolling.  However, here again, because I do not find any authority that indicates that Wisconsin would not adopt cross-jurisdictional tolling, I predict that Wisconsin would recognize cross-jurisdictional tolling under *American Pipe*.

Accordingly, Amazon's motion to dismiss the claims under Wisconsin law is DENIED.

### C.  *Leave to Amend*

Plaintiffs request leave to amend the operative complaint, and indicated that the amended complaint would "add additional plaintiffs" and "a claim under" Massachusetts law.  (Opp'n 40 & n.14.)  Plaintiffs also state that "to the extent agrees [*sic*] that Plaintiffs have pled per se violations of Hawaii, Illinois, Maryland, Minnesota, Mississippi, New Hampshire, Nevada, Tennessee, and West Virginia law, Plaintiffs will seek leave to amend their complaint to include claims on behalf of purchasers from those states who purchased Class Products directly from third-party sellers."  (*Id.*)

Federal Rule of Civil Procedure 15(a)(2) states that a "court should freely give leave [to amend] when justice so requires."  Rule 15(a)(2) is a "liberal" and "permissive" standard in accord with the Second Circuit's "strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (internal quotation marks omitted).  Plaintiffs have already identified ways to amend the operative complaint, such as adding claims and plaintiffs, which would assist me in resolving these disputes on the merits.  Given the "liberal" and "permissive" standard, and because Amazon does not object, Plaintiffs' request for leave to amend is GRANTED.

If Plaintiffs wish to amend the operative complaint, they must do so no later than 45 days after the entry of this Opinion & Order.  Any filing of an amended complaint must also include a redline comparing that new complaint with the operative complaint.  If Plaintiffs does not file an amended complaint, Defendant shall file an answer to the operative complaint no later than 90 days after the entry of this Opinion & Order.

## V.    Conclusion

For the reasons stated herein, Defendant's motion to dismiss the First Amended Complaint is GRANTED IN PART and DENIED IN PART.  Specifically, the following claims survive dismissal[48]:

- Arizona claims between November 8, 2018, and March 2019;

- Arkansas claims before August 1, 2017;

- Connecticut claims;

- Florida claims between November 8, 2018 and March 2019;

- Hawaii claims;

- Illinois antitrust claims;

- Iowa claims;

- Maine claims;

- Maryland claims;

- Michigan claims;

- Minnesota claims;

- Nebraska claims;

---

[48] If no time frame is listed, then the claims as alleged in the First Amended Complaint survive.

- Nevada claims;

- New Hampshire antitrust claims;

- New Mexico claims;

- New York claims;

- North Carolina claims;

- North Dakota claims;

- Oregon claims;

- Rhode Island claims;

- South Dakota claims;

- Utah claims;

- Vermont claims;

- West Virginia claims; and

- Wisconsin claims.

The remaining claims are DISMISSED without prejudice.

The Clerk of Court is respectfully directed to terminate Document 59.

SO ORDERED.

Dated:      September 18, 2025
            New York, New York

Vernon S. Broderick
United States District Judge